**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JILL DOE, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>    v.<br><br>THE WEINSTEIN COMPANY HOLDINGS, LLC, HARVEY WEINSTEIN, ROBERT WEINSTEIN, DIRK ZIFF, TIM SARNOFF, MARC LASRY, TARAK BEN AMMAR, LANCE MAEROV, RICHARD KOENIGSBERG, PAUL TUDOR JONES, JAMES DOLAN, DAVID GLASSER, FRANK GIL, BARBARA SCHNEEWEISS and JOHN DOES 1-50, inclusive,<br><br>                    Defendants. | Case No. 1:19-cv-03430<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. JURISDICTION AND VENUE ......................................................................... 5

III. THE PARTIES ................................................................................................... 6

    A. Plaintiff ...................................................................................................... 6

    B. Defendants ................................................................................................. 6

IV. FACTS ............................................................................................................... 11

    A. Weinstein's power in the entertainment industry—from his time at both Miramax and TWC—was extensive. ............................................ 11

    B. Hollywood business, which includes the business of performing, is regularly conducted on the road and at hotels. ...................................... 13

    C. Weinstein's predatory behavior followed a pattern designed for his personal gratification at the expense of Plaintiff and the Class. .......................... 18

    D. Like many of the Class members, Plaintiff Jill Doe was assaulted while Weinstein worked for TWC (2016-17). ...................................... 28

    E. Officers, Directors, and Employees of TWC facilitated, had knowledge of, or should have known of Weinstein's predatory behavior. .......................................................................................................... 34

        1. Harvey Weinstein's employment contracts, approved by the Board, served to insulate him from recourse for sexual misconduct. ........................................................................... 34

        2. Employees of TWC often aided and abetted Weinstein in the commission of his sexual misconduct. .................................. 37

        3. Director Robert Weinstein (October 21, 2005–July 13, 2018) knew or should have known that Harvey Weinstein was a serial sexual predator. .................................................. 40

        4. Director Lance Maerov (October 21, 2005–July 13, 2018) knew or should have known that Harvey Weinstein was a serial sexual predator. ............................................................ 52

5.      Director Tarak Ben Ammar (October 21, 2005–July 13, 2018) knew or should have known that Harvey Weinstein was a serial sexual predator. .................................................... 59

6.      Director Richard Koenigsberg (October 21, 2005–October 14, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator. .................................................... 64

7.      Director Dirk Ziff (October 21, 2005–April 30, 2009; in or about 2011–October 6, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator. ............................... 69

8.      Director Tim Sarnoff (June 25, 2013–October 6, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator. ............................... 75

9.      Director James Dolan (September 30, 2015–June 20, 2016) knew or should have known that Harvey Weinstein was a serial sexual predator. ............................... 81

10.     Director Paul Tudor Jones (October 20, 2015-October 7, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator. .................................................... 87

11.     Director Marc Lasry (June 20, 2016–October 7, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator. ............................... 91

12.     TWC's President and Chief Operating Officer David Glasser (2008–February 16, 2018) knew or should have known that Harvey Weinstein was a serial sexual predator. ................... 93

13.     TWC's Vice President of Human Resources Frank Gil (2007–October 9, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator. ...................................... 96

14.     TWC Officer Barbara Schneeweiss (2005-2017) knew or should have known of Harvey Weinstein's predatory sexual misconduct. .................................................... 98

F.      The TWC Board's termination of Harvey Weinstein is too little, too late. ................................................................. 99

G.      The statutes of limitations are tolled by the pendency of the *Geiss* class action, equitable estoppel, duress, and the continuing violations doctrine. .......................................... 102

V.      CLASS ALLEGATIONS ...................................................... 110

010717-11/1104435 V2

VI.     CAUSES OF ACTION ...................................................................................... 113

COUNT I VIOLATION OF 18 U.S.C. § 1591, 1595 (SEX TRAFFICKING)
            (PLAINTIFF JILL DOE VERSUS HARVEY WEINSTEIN) ...................................... 113

COUNT II  VIOLATION OF 18 U.S.C. §§ 1591 AND 1595 (PARTICIPATION
            IN A VENTURE ENGAGED IN SEX TRAFFICKING) (PLAINTIFF
            JILL DOE VERSUS TWC, THE TWC DIRECTORS AND TWC
            OFFICERS) .............................................................................................. 115

COUNT III  NEGLIGENT SUPERVISION AND RETENTION  (JILL DOE
            VERSUS TWC, TWC'S DIRECTORS, AND TWC'S OFFICERS) .......................... 117

COUNT IV  CIVIL BATTERY  (JILL DOE VERSUS TWC, TWC DIRECTORS
            AND TWC OFFICERS) ................................................................................ 118

COUNT V  ASSAULT  (JILL DOE VERSUS TWC, TWC DIRECTORS, AND
            TWC OFFICERS) ....................................................................................... 119

COUNT VI  FALSE IMPRISONMENT  (JILL DOE VERSUS TWC, TWC
            DIRECTORS, AND TWC OFFICERS) ............................................................. 120

COUNT VII  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
            (JILL DOE VERSUS TWC, TWC DIRECTORS, AND TWC
            OFFICERS) .............................................................................................. 121

COUNT VIII  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS  (JILL
            DOE VERSUS TWC, TWC DIRECTORS, AND TWC OFFICERS) ...................... 123

COUNT IX  RATIFICATION  (JILL DOE VERSUS TWC, TWC DIRECTORS,
            AND TWC OFFICERS) ................................................................................ 124

PRAYER FOR RELIEF ............................................................................................. 125

Plaintiff Jill Doe, individually and on behalf of all others similarly situated, complains of The Weinstein Company Holdings, LLC ("TWC"), Harvey Weinstein ("Weinstein" or "Harvey Weinstein"), Robert Weinstein ("Robert Weinstein"), Dirk Ziff, Tim Sarnoff, Marc Lasry, Tarak Ben Ammar, Lance Maerov, Richard Koenigsberg, Paul Tudor Jones, Jeff Sackman, James Dolan (Harvey Weinstein, Robert Weinstein, Ziff, Sarnoff, Sackman, Lasry, Ben Ammar, Maerov, Koenigsberg, Jones, and Dolan may collectively be referred to as "TWC Directors" or "Board"), David Glasser, Frank Gil, Barbara Schneeweiss, (Harvey Weinstein, Robert Weinstein, Glasser, Gil, and Schneeweiss may collectively be referred to as "TWC Officers"), as follows:

## I.    INTRODUCTION

1.      Harvey Weinstein used the proverbial "casting couch" as his office of choice, luring Plaintiff and Class members to meetings under the guise he would help with their careers when, in fact, his primary goal was to sexually abuse them. Weinstein's use of his power to abuse women was known, ratified and condoned by TWC and its officers and directors.

2.      While the TWC Directors have publicly disclaimed knowledge, knowledge of Harvey Weinstein's "odious" and "rotten" sexual misconduct – his "voracious rapacity; like a gluttonous ogre out of the Brothers Grimm" – ran deep.[1] Defendants knew Weinstein was targeting and abusing Class members with the promise of movie, writing and production roles. According to a screenwriter who worked with Harvey Weinstein: "Everybody-f******- knew." [2]

---

[1] https://deadline.com/2017/10/scott-rosenberg-harvey-weinstein-miramax-beautiful-girls-guilt-over-sexual-assault-allegations-1202189525/

[2] https://deadline.com/2017/10/scott-rosenberg-harvey-weinstein-miramax-beautiful-girls-guilt-over-sexual-assault-allegations-1202189525/

3.     Moreover, with two major events in 2015, the TWC Directors could no longer claim ignorance of Weinstein's sexual abuse of women. First, the TWC Directors became aware of a New York Police Department sting operation, in which Weinstein was secretly recorded admitting to an assault of a model.[3]

4.     Also in 2015, a female employee wrote a memo to the Human Resources Department detailing Weinstein's sexual abuse of Class members and how Weinstein used female employees to lure women to meetings where the abuse occurred. HR shared the memo with Robert Weinstein, who shared it with the Board of Directors.

5.     With Weinstein's predatory behavior documented by the police and an employee, the TWC Board had a duty of care to protect the Class. Had the Board of Directors exercised their duty of care to protect women from a predator, Jill Doe would not have been assaulted throughout 2016 and early 2017. Harvey Weinstein's abuse of power and sexual abuse of Jill Doe was entirely preventable but for the TWC Directors' ratification of Weinstein's actions.

6.     Plaintiff, and hundreds of other females like her, found themselves with Weinstein on the casting couch at offices, in hotel rooms, in his homes, or in rooms at industry functions. Under the guise of meetings ostensibly to help further Plaintiff's and Class members' careers, or to hire them, or to make a business deal with them, or to network at industry events, Weinstein isolated Plaintiff and Class members in an attempt to engage in unwanted sexual

---

[3] A 2015 audio recording of Weinstein aggressively attempting to coerce Battilana Gutierrez to come into his hotel room was published by *The New Yorker* on October 10, 2017 and is available at https://www.youtube.com/watch?v=JVu02qk3-Jc (last accessed Nov. 2, 2017). It is also available with closed captioning at https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories (last accessed Nov. 2, 2017). When Battilana Gutierrez refused, saying "I don't want to be touched" and "Please, I don't want to do something I don't want to do," he tells her, "Don't ruin your friendship with me" and "Never call me again." *Id.*

conduct that took many forms: flashing, groping, fondling, harassing, battering, false

imprisonment, sexual assault, attempted rape, and/or completed rape.

7.      Plaintiff and members of the Class had or wanted to have careers or wanted to

make deals in the entertainment industry and correctly understood that Weinstein was a powerful

force in the entertainment production world. At all times, Plaintiff and the Class operated under

duress and the credible and objective threat of being threatened, deceived, or blacklisted by

Weinstein and major film producers such as TWC if they refused Weinstein's unwanted sexual

advances or complained about his behavior. To the extent a woman was "lucky" enough to

escape physically unscathed, Weinstein's behavior (and the fact it was facilitated by Defendants)

nonetheless caused injury to her business prospects, career, and reputation, and caused severe

emotional and physical distress.

8.      Weinstein's power and the pervasiveness of his misconduct were summarized in

*The New Yorker* as follows:

> Since the establishment of the first studios, a century ago,
> there have been few movie executives as dominant, or as
> domineering, as Harvey Weinstein. He co-founded the production-
> and-distribution companies Miramax and the Weinstein Company,
> helping to reinvent the model for independent films with movies
> including "Sex, Lies, and Videotape," "The Crying Game," "Pulp
> Fiction," "The English Patient," "Shakespeare in Love," and "The
> King's Speech." Beyond Hollywood, he has exercised his
> influence as a prolific fund-raiser for Democratic Party candidates,
> including Barack Obama and Hillary Clinton. Weinstein combined
> a keen eye for promising scripts, directors, and actors with a
> bullying, even threatening, style of doing business, inspiring both
> fear and gratitude. His movies have earned more than three
> hundred Oscar nominations, and, at the annual awards ceremonies,
> he has been thanked more than almost anyone else in movie
> history, ranking just after Steven Spielberg and right before God.
>
> For more than twenty years, Weinstein, who is now sixty-
> five, has also been trailed by rumors of sexual harassment and
> assault. His behavior has been an open secret to many in

Hollywood and beyond, but previous attempts by many publications, including *The New Yorker*, to investigate and publish the story over the years fell short of the demands of journalistic evidence. Too few people were willing to speak, much less allow a reporter to use their names, and Weinstein and his associates used nondisclosure agreements, payoffs, and legal threats to suppress their accounts. Asia Argento, an Italian film actress and director, said that she did not speak out until now—Weinstein, she told me, forcibly performed oral sex on her—because she feared that Weinstein would "crush" her. "I know he has crushed a lot of people before," Argento said. "That's why this story—in my case, it's twenty years old, some of them are older—has never come out."

9.      On October 5, 2017, *The New York Times*, in a report by Jodi Kantor and Megan Twohey, revealed multiple allegations of sexual harassment against Weinstein, an article that led to the resignation of four members of the TWC's all-male board and to Weinstein's firing.[4]

10.     Weinstein's widespread sexual misconduct did not occur without the help of others. Rather, over time, Weinstein enlisted the aid:

    a.      of TWC employees to facilitate the assaults;

    b.      of TWC which paid, at the direction of TWC Officers, lawyer David Boies, Kroll Associates, Inc. and Corporate Risk Holdings, LLC ("Kroll"), a global leader in corporate intelligence, and other companies to cover-up Harvey Weinstein's pattern of assault and to silence his victims;

    c.      of TWC's Directors, Robert Weinstein, Ziff, Sarnoff, Lasry, Ben Ammar, Maerov, Koenigsberg, Jones, and Dolan, who knew of many complaints against Weinstein but who nonetheless deliberately chose not to conduct an independent

---

[4] Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. TIMES (Oct. 5, 2017), https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

investigation of any misconduct, but instead took the word of the perpetrator at face value in dereliction of their duties;

       d.    of TWC Officers Robert Weinstein, Glasser, Gil, and Schneeweiss, who knew of and approved Weinstein's use of corporate funds to perpetuate the assaults and silence his victims, knew of complaints against Weinstein but took no action in dereliction of their duties (or took action to silence the victims rather than address the perpetrator), implemented human resources procedures that would result in retaliation against victims, and/or made or knew of and approved settlement payouts to victims of Harvey Weinstein's sexual assaults.

11.    Plaintiff seeks certification of a Rule 23(c)(4) class for liability for sex trafficking, negligent retention and supervision, civil battery, assault, false imprisonment, intentional and negligent infliction of emotional distress, and ratification. Defendants' conduct has caused widespread damage, including personal injury, emotional distress, and damage to the careers of Plaintiff and the Class, for which Defendants must be held responsible.

## II.    JURISDICTION AND VENUE

12.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including 18 U.S.C. § 1591.

13.    This Court also has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are dozens, and likely hundreds, of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000.00; and Defendants are citizens of a State different from that of Plaintiff and members of the Class. This Court also has

subject matter jurisdiction over Plaintiff's and the proposed Class's claims pursuant to 28 U.S.C. § 1367(a).

14.     Venue is proper in this District under 28 U.S.C. § 1391 (a)–(d) because, *inter alia*, substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

### III.     THE PARTIES

**A.     Plaintiff**

15.     Jill Doe is a citizen of the United States and a resident of New York, New York. Jill Doe met Harvey Weinstein in 2016 just as she was graduating from college with a degree relating to the film industry. He gained her trust over time as he mentored her in acting and film production. However, after gaining her trust, and under the guise he had forgotten an iPad in his hotel room, he imprisoned her in his hotel room, assaulted her, and forced her to give him oral sex – over her continued objections and protests. Over the course of nine months, this cycle continued. He would promise not to assault her again and instead maintain a professional relationship, but then would again force her to take care of him sexually. She suffered severe emotional and physical distress and anxiety as a result.

**B.     Defendants**

16.     Defendant The Weinstein Company Holdings, LLC is a Delaware limited liability company whose principal place of business is in New York City, New York.

17.     Defendant Harvey Weinstein is a citizen of the United States and a resident of Westport, Connecticut. He is a former co-chairman of Miramax, and was Co-Chairman and a Director of TWC from October 21, 2005 to October 7, 2017.

18.     Defendant Robert Weinstein is a citizen of the United States and a resident of Greenwich, Connecticut. Robert Weinstein is the brother of Harvey Weinstein, the former

chairman of Miramax, and was a Director and Co-Chairman of TWC from October 21, 2005 to

July 13, 2018. Robert Weinstein has known of Harvey Weinstein's pattern and practice of

predatory sexual conduct toward women, including during the time the brothers worked at

Miramax and TWC.

19.     Defendant Dirk Ziff is a citizen of the United States and a resident of New York,

New York. Dirk Ziff was a director of TWC from October 2005 to October 6, 2017. A couple of

years after TWC's launch, Ziff allegedly extended TWC a lifeline in the form of a loan worth

tens of millions of dollars. In 2009, TWC underwent a major restructuring in which the lenders

exchanged debt for a large portion of the equity. Ziff and Harvey Weinstein were renowned in

show-biz circles for partying together. In a 2012 interview on CNN, Weinstein boasted that he

and Ziff had a blast when years earlier they had chaperoned a young Chelsea Clinton at a concert

at a rock club on Martha's Vineyard. Ziff was considered by members of the TWC Board as a

"Harvey Loyalist," who made decisions based on his personal friendship with Weinstein and the

benefits Harvey would throw his way – such as invites to the Oscars and other Hollywood

events. Ziff knew of Weinstein's pattern and practice of predatory sexual conduct toward women

from both his personal relationship with Weinstein and his position as a director of TWC.

20.     Defendant Tim Sarnoff is a citizen of the United States and a resident of Westlake

Village, California. Sarnoff is the President of Technicolor's Production Services Division,

which counted TWC as one of its customers. Tim Sarnoff was a director of TWC from June 25,

2013 to October 6, 2017. Sarnoff was considered by members of the TWC Board as a "Harvey

Loyalist," who made decisions based on his personal friendship with Weinstein and the benefits

Harvey would throw his way such as invites to the Oscars and other Hollywood events. Sarnoff

knew of Weinstein's pattern and practice of predatory sexual conduct toward women from both his personal relationship with Weinstein and his position as a director of TWC.

21.     Defendant Marc Lasry is a citizen of the United States and a resident of New York, New York. Marc Lasry was a director of TWC from in or about June 20, 2016 to October 6, 2017. Lasry knew of Weinstein's pattern and practice of predatory sexual conduct toward women from both his personal relationship with Weinstein and his position as a director of TWC.

22.     Defendant Tarak Ben Ammar is a citizen of Tunisia and currently resides in France.  Tarak Ben Ammar was a director of TWC from October 21, 2005 to July 13, 2018. Ammar knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his position as a director of TWC. Ammar admitted that he and the TWC Board were aware that Weinstein had been accused of groping model Ambra Battilana Gutierrez in 2015.[5] According to Ammar, the majority of the then-TWC Board members supported renewing Weinstein's contract despite the serious assault allegations.[6]

23.     Defendant Lance Maerov is a citizen of the United States and a resident of Bedford, New York. Maerov is an Executive Vice President at WPP, which is a holding group that invests in media companies. Maerov serves on the boards of multiple media companies in which the holding group invests in order to protect WPP's interests. Because WPP became a minority stakeholder in The Weinstein Company in late 2005, Maerov was designated to sit on TWC's Board. Maerov was a director of TWC from March 18, 2013 to July 13, 2018, and was a

---

[5] Elsa Keslassy, *TWC Board Member: We Demanded Harvey Re-Sign Code of Conduct in 2015*, VARIETY (Oct. 11, 2017).

[6] Shawn Tully, *How a Handful of Billionaires Kept Their Friend Harvey Weinstein in Power*, FORTUNE (Nov. 24, 2017), http://fortune.com/2017/11/19/weinstein-scandal-board-battles/.

non-voting observer from late 2005 to March 17, 2013. Maerov knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his position as a director of TWC. According to Maerov, for years prior to the 2015 Gutierrez allegations, he had heard from TWC employees about complaints against Weinstein.[7]

24.     Defendant Richard Koenigsberg is a citizen of the United States and a resident of Franklin Lakes, New Jersey. Richard Koenigsberg was a director of TWC from October 21, 2005 through on or about October 14, 2017. Harvey and Robert Weinstein's long-time personal accountant, Koenigsberg listed his firm's address as the main address for the Miriam and Max Weinstein Foundation, which Harvey and Robert Weinstein formed in their parents' names to support underprivileged children. Koenigsberg was considered by the other Directors to be a "Harvey Loyalist." Koenigsberg knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his personal relationship with Weinstein and his position as a director of TWC.

25.     Defendant Paul Tudor Jones is a citizen of the United States and a resident of Palm Beach, Florida. Jones was a director of TWC from October 20, 2015 to October 7, 2017. A personal friend of Harvey Weinstein, Jones was considered by the other Directors to be a "Harvey Loyalist." Jones knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his personal relationship with Weinstein and his position as a director of TWC. In fact, even when the stories of assault were published in The New York Times, Jones was the only Director who did not vote to terminate Harvey Weinstein and the only then-acting Director who did not sign a statement condemning Harvey Weinstein's actions.

---

[7] *Id.*

26.     Defendant James L. Dolan is a citizen of the United States and a resident of Miller Place, New York. Dolan was a director of TWC from about September 30, 2015 (before Harvey Weinstein's 2015 contract was approved) to June 20, 2016. Dolan was considered by members of the TWC Board as a "Harvey Loyalist," who made decisions based on his personal friendship with Weinstein and the benefits Harvey would throw his way such as invites to the Oscars and other Hollywood events. Harvey publicly praised Dolan as "one of my and Bob's best friends" when Dolan left the Board in June of 2016. Dolan knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his personal relationship with Weinstein and his position as a director of TWC.

27.     Defendant David Glasser is a citizen of the United States and a resident of New York. Glasser was TWC's President and Chief Operating Officer since 2011. He worked at TWC from 2008 until his termination in February 2018.[8] He was known as Harvey Weinstein's and Robert Weinstein's "third brother," serving as Harvey Weinstein's right-hand man.[9] Glasser knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his personal relationship with Weinstein and his position as an officer of TWC.

28.     Defendant Frank Gil is a citizen of the United States and a resident of New York. Gil was the Vice President of Human Resources for TWC from April 2007 to October 2017. Gil knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his position in human resources at TWC.

---

[8] He purportedly left TWC for just a one-month hiatus in 2015 but returned for a three-year deal. http://www.latimes.com/business/hollywood/la-fi-ct-david-glasser-weinstein-20180218-story.html#

[9] http://www.latimes.com/business/hollywood/la-fi-ct-david-glasser-weinstein-20180218-story.html#

29.     Defendant Barbara Schneeweiss is a resident of New York and citizen of the United States. Schneeweiss was the Vice President of Production and Development, Film & Television, for TWC from 2005 until in or about October 2017, and was the Vice President of Television Development at Miramax from 1996 to 2005. Throughout the period since 1996, Schneeweiss worked for and reported directly to Harvey Weinstein, and regularly procured and delivered victims to Harvey Weinstein in his office and hotel rooms knowing the women would be assaulted.

30.     By virtue of their positions as officers or directors of New York-based corporations, each of the Officer and Director Defendants availed themselves of the laws of New York and are subject to jurisdiction in New York.

## IV.   FACTS

**A.   Weinstein's power in the entertainment industry—from his time at both Miramax and TWC—was extensive.**

31.     In the late 1970s, using profits from their concert promotion business, brothers Harvey and Robert Weinstein created a small independent film-distribution company named Miramax, named after their parents, Miriam and Max. The company's first releases were primarily music-oriented concert films such as Paul McCartney's *Rockshow. The Secret Policeman's Other Ball*, released in May 1982, became Miramax's first hit. The Weinsteins slowly built upon this success throughout the 1980s with films that achieved both critical attention and modest commercial success. Harvey Weinstein and Miramax gained wider attention in 1988 with the release of Errol Morris' documentary *The Thin Blue Line*, which detailed the struggle of Randall Adams, a wrongfully convicted Death Row inmate. The publicity that soon surrounded the case resulted in Adams' release and nationwide publicity for

Miramax. In 1989, Steven Soderbergh's *Sex, Lies, and Videotape* propelled Miramax to become the most successful independent studio in America.

32.     Miramax continued to grow its library of films and directors. In 1993, after the success of *The Crying Game*, Disney offered to purchase Miramax from the Weinsteins for $80 million. The Weinstein brothers agreed to the deal, which promised to cement their Hollywood clout and ensure that they would remain at the head of their company. The next year, Miramax released its first blockbuster, Quentin Tarantino's *Pulp Fiction*, and distributed the popular independent film *Clerks*.

33.     Miramax won its first Academy Award for Best Picture in 1997 with the victory of The English Patient (Pulp Fiction was nominated in 1995 but lost to Forrest Gump). This was the first in a series of critical successes that included Good Will Hunting (1997) and Shakespeare in Love (1998), both of which won numerous Academy Awards.

34.     The Weinstein brothers left Miramax on September 30, 2005, to form their own production company, TWC, with several other media executives. Attached as Exhibit A is a list of Weinstein-produced films that demonstrates Weinstein's power and influence in the film industry.

35.     Despite Disney's and Miramax's knowledge of Weinstein's conduct, Miramax continued to work with Harvey Weinstein after he and his brother started TWC, including but not limited to on the long-running Project Runway TV show.

36.     Plaintiffs and the Class were aware of Weinstein's ability to make or break their careers, as well as to continue to inflict emotional distress. Moreover, Weinstein wielded and was outspoken about his power and ability to either launch their careers or ruin their personal and professional reputations forever.

**B.    Hollywood business, which includes the business of performing, is regularly conducted on the road and at hotels.**

37.     The entertainment business encompasses more than acting – it requires producers, directors, engineers, lawyers, agents, writers, artists, publicists, advertisers, sales-people, chefs, drivers, and many other roles. Thus, while many of the class members are actors – the class also includes any woman who was meeting with Harvey Weinstein for business-related purposes.

38.     And, like lawyers or engineers, actors are pursuing a career that is a business. It takes more to launch a performing career than majoring in drama and getting on the bus for New York or L.A.

39.     Actors are independent contractors. They work for film and television companies in what is essentially a gig economy structure, i.e. an environment in which temporary positions are common and organizations contract with independent workers for short-term engagements.

40.     Actors hire talent agencies and management companies to solicit auditions (job interviews) and offers of employment. These companies act as employment agencies. They submit their clients for auditions and offers through casting companies that have been hired by production companies.

41.     Actors sign contractual agreements with talent agencies and management companies, who receive a commission payment on all film and television work for which an actor is hired. The agencies negotiate the contractual terms of employment on each actor's behalf, including pay rate, days of work, per diem and travel if applicable, publicity obligations and terms of use, credits (job title) and future residual payments. All of these terms are governed by the SAG-AFTRA collective bargaining agreement, which all production companies must enter in order to work with union actors. Salaries are negotiable but there is a base salary for all jobs.

- 13 -

42.     Professional actors become members of the labor union SAG-AFTRA upon being hired for their first job as a Principal Player on a production that has a collective bargaining deal with SAG-AFTRA. Actors pay union dues, and receive health and pension benefits through the union. Actors also audition (job interview) and work under union guidelines.

43.     The business of film and television is a business of connections and relationships, like most businesses. Actors establish relationships with directors, producers and studio executives either by working with them or through conversations and connections made at social or work-related events. It is common to receive opportunities to audition or receive an offer for a project through these connections. Networking at industry and social events is thus an important part of the business – and in fact, costs to attend such events are recognized by the IRS as business expenses.

44.     For example, Caitlin Dulany's son attended elementary school with the child of a producer of a television series. As a result of knowing one another through events at their children's school, this producer requested that the casting office audition her on three separate occasions for acting roles in the series. Dulany was offered the third role, a guest spot on the CBS series, Eleventh Hour.

45.     The Internal Revenue Service recognizes the monies that actors must pay out of pocket to pursue their career as business expenses. Specifically, any ordinary and necessary expenses that actors paid for out of their own pockets that were directly related to their acting activity are deductible as a business expense.

46.     Typical deductible expenses for actors include, but are not limited to, the following:

- 14 -

- Business Travel: Airfare or other transportation costs and hotel or other lodging expenses, and 50% of the cost of meals;

- Local Travel Expenses: Deductible local travel may include trips to performances (both as player and observer), rehearsals, acting Class, auditions, and to pick up supplies;

- Agent Fees: All fees an actor pays to an agent;

- Manager Fees: Talent manager fees;

- Office Expenses: An outside office or office in the home used exclusively for an acting business;

- Property and Supplies Used for Acting: The cost of video cameras, sound equipment, digital cameras, theater and film books, musical scores, computers, and cell phones;

- Union Dues: Dues to belong to Actors Equity or other unions or organizations;

- Education: Acting Class and coaching lessons;

- Promotional expenses: Photos, videos, websites (including Internet connection costs), listings in professional registries, advertisements in trade publications, business cards, and other promotional expenses;

- Make-up and Hair Care: Related expenses are deductible when incurred in connection with a specific job;

- Wardrobe: The cost of any clothing not suitable for street wear--for example, the cost of a modern business suit is not deductible, but a gorilla costume is deductible;

- Subscriptions: The cost of magazine, journal, newsletter, and other subscriptions useful for your acting business--for example, trade newspapers like Daily Variety;

- Legal and Professional Services: Fees paid to attorneys, accountants, consultants, and other professionals;

- Tickets for Viewing Films and Plays: Actors need to attend plays and films to keep up with what's going on in their industry. They may also subscribe to services like Netflix and HBO. These costs are deductible as research.

All of these expenses add up for professional actors, easily equaling 20 to 35 percent of acting income.

47.     Much of the entertainment business is conducted on the road, on location where productions are filmed, at film festivals where new ideas are pitched, at awards shows where new contacts are made, and on tours of visiting various cities to identify new talent. Networking and making contacts is crucial for actors.

48.     Thus, it is not unusual for participants in the film industry to set up offices in hotel suites, and to schedule meetings in those suites. The business of being an actor requires actors to meet with producers in hotel rooms. The fact that meetings take place in hotel rooms does *not* indicate that sexual misconduct will occur. Many business meetings that take place in hotel rooms are completely professional – and expected.

49.     In fact, talent agencies, including agencies that represented Class members such as Creative Arts Agency and William Morris, regularly scheduled meetings for their clients with Weinstein and other producers in hotel rooms.

50.     According to a Miramax and TWC officer who also regularly acted as Weinstein's assistant, Barbara Schneeweiss, "it was customary for Weinstein to book a hotel

suite in whichever city he found himself. That suite would typically include meeting spaces, in addition to personal living space."[10]

51.     Schneeweiss also stated: "even when Weinstein was located in a city in which Miramax did maintain an office, Weinstein would at times often book a suite with meeting space anyway."[11] She explained that "Weinstein would then use those meeting spaces for the[sic] much of the business he could conduct in that city, including for meetings."[12]

52.     In fact, according to Schneeweiss, "while at times he would conduct business meetings in the lobbies or restaurants of such hotels, the majority of his meetings would be conducted in his hotel suite."[13]

53.     Even when actors expressed concern about meeting with Weinstein in his hotel room for business purposes, they were told by Weinstein's assistants and their talent agents that they had no choice but to do so for whatever audition, part, pitch or business proposal was involved.

54.     In sum, acting is a career cultivated within an industry that performs and provides services, just like professional athletes, lawyers, physicians, therapists and various other industries which are critical to the economy but nonetheless don't produce widgets.

---

[10] Amended Statement of Defense and Crossclaim of Barbara Schneeweiss, ¶¶ 6-7, *Jane Doe v. Harvey Weinstein et al.,* No. CV-17-585459 (Ontario Sup. Ct. of Justice).

[11] *Id.,* ¶ 8-9.

[12] *Id.*

[13] *Id.,* ¶ 10.

**C.**   **Weinstein's predatory behavior followed a pattern designed for his personal gratification at the expense of Plaintiff and the Class.**

55.   Wielding unfettered power in the movie and television industry, Weinstein has admitted that his predatory and sexually harassing behavior toward women was his modus operandi. For example, in an audio recording captured during a 2015 New York Police Department sting operation, Weinstein admitted that he groped a model named Ambra Battilana Gutierrez, describing it as behavior he is "used to."[14]

56.   An executive who worked for Weinstein for many years reportedly told The New Yorker, "This wasn't a one-off. This wasn't a period of time. This was ongoing predatory behavior toward women—whether they consented or not."[15]

57.   The manner in which Weinstein set up, harassed, and assaulted Plaintiffs and the members of the Class followed a pattern. As *The New York Times* explained,

> Across the years and continents, accounts of Weinstein's conduct share a common narrative: Women reported to a hotel for what they thought were work reasons, only to discover that Weinstein, who has been married for most of three decades, sometimes seemed to have different interests. His home base was New York, but his rolling headquarters were luxury hotels: the Peninsula Beverly Hills and the Savoy in London, the Hôtel du Cap-Eden-

---

[14] A 2015 audio recording of Weinstein aggressively attempting to coerce Battilana Gutierrez to come into his hotel room was published by *The New Yorker* on October 10, 2017 and is available at https://www.youtube.com/watch?v=JVu02qk3-Jc (last accessed Nov. 2, 2017). It is also available with closed captioning at https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories (last accessed Nov. 2, 2017). When Battilana Gutierrez refused, saying "I don't want to be touched" and "Please, I don't want to do something I don't want to do," he tells her, "Don't ruin your friendship with me" and "Never call me again." *Id.*

[15] Ronan Farrow, *From Aggressive Overtures to Sexual Assault: Harvey Weinstein's Accusers Tell Their Stories*, THE NEW YORKER (Oct. 10, 2017), https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

Roc near the Cannes Film Festival in France and the Stein Eriksen Lodge near the Sundance Film Festival.[16]

58.  An employee who worked for Weinstein told The New Yorker that "the pattern of meetings was nearly uninterrupted in her years of working for Weinstein."[17]

59.  Since October 10, 2017, more than 100 women have reported that Weinstein used his power in the entertainment industry to sexually harass them. On information and belief, these reports are just the beginning of the revelation of the full scope of Weinstein's misconduct. All of these reports follow the same pattern. For illustrative purposes of Weinstein's pattern and practice of sexual harassment against Plaintiffs and the Class, Plaintiffs provides the following non-exhaustive list of examples of Weinstein's predatory behavior that have been widely reported in the media:

60.  *Weinstein's pattern of using the guise of helping women with their careers was typically the start:*

a.  After Weinstein hired her for the lead in the Miramax-produced *Emma*, but before shooting began in or about 1994, Gwyneth Paltrow received a faxed schedule from her agents at Creative Artists Agency scheduling a meeting with Weinstein in his suite at the Peninsula Beverly Hills for a work meeting.[18]

b.  In 1996, starring in a new film to which Miramax had just obtained the rights, Judith Godrèche was invited to a breakfast meeting with Weinstein and a female

---

[16] Kantor & Twohey, *supra* note 1.

[17] Farrow, *supra* note 10.

[18] Jodi Kantor & Rachel Abrams, *Gwyneth Paltrow, Angelina Jolie and Others Say Weinstein Harassed Them*, N.Y. TIMES (Oct. 10, 2017), https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html.

Miramax executive to discuss the movie.[19] She later called a female Miramax executive to seek advice about the situation. The executive told her not to say anything, lest she hurt the film's release.[20] As Godrèche described, "This is Miramax . . . You can't say anything."[21]

      c.     Asia Argento, a 21-year-old actress with a role in a Miramax film released in the United States in 1999, was told during filming in 1997 to attend a party thrown by Miramax at a hotel and was brought to the hotel by another producer.[22]

      d.     In the 1990s, Rosanna Arquette was told to meet Weinstein for dinner at a hotel to pick up the script for a new Miramax film.[23]

      e.     In the 1990s, Weinstein invited Ashley Judd to the Peninsula Hotel for a business breakfast meeting concerning Miramax projects.[24]

      f.     In or about 1997, Weinstein invited himself to Mira Sorvino's apartment—after midnight—to tell her about "new marketing ideas" for a Miramax film she was in.[25]

---

[19] *Id.*

[20] *Id*.

[21] *Id*.

[22] Farrow, *supra* note 10.

[23] *Id*.

[24] Kantor & Twohey, *supra* note 1.

[25] Farrow, *supra* note 10.

g.      In 2003, Dawn Dunning was invited by Weinstein's assistant to a meal with Weinstein at a New York hotel.[26] She had met Weinstein while she was waitressing in a nightclub, and he offered her a screen test at Miramax.[27]

h.      Lucia Stoller was approached by Weinstein in 2004, who had a Miramax assistant call to set up a daytime meeting at the Miramax office in Tribeca, first with Weinstein and then with a casting executive, who was a woman (which made Lucia feel safer).[28]

i.      In 2010, Weinstein told actress Emma de Caunes he was interested in casting her in the lead role of a TWC movie adapted from a book, asking her to come to his hotel room after lunch to get the book.[29]

j.      In January 2011, Weinstein invited Jessica Barth to a business meeting at the Peninsula Hotel to talk about TWC projects and her career. [30]

k.      In 2015, Italian model Amber Battilana Gutierrez met with Weinstein in the TWC offices for what she was told would be a "business meeting."[31]

61.      *When the women arrived for their "meeting," they were isolated from the public or witnesses:*

---

[26] Kantor & Abrams, *supra* note 13.

[27] *Id*.

[28] Farrow, *supra* note 10.

[29] *Id.*

[30] *Id*.

[31] *Id*.

a.      Although Lucia Stoller's meeting took place at Miramax, "[s]he was led to an office with exercise equipment in it, and takeout boxes on the floor. Weinstein was there, alone."[32]

b.      A producer invited Asia Argento, who was working on the Miramax-distributed movie *B. Monkey*, to what she thought was a party thrown by Miramax at the Hotel du Cap-Eden-Roc. She felt obligated to attend, but when the producer led her upstairs, he took her to a hotel room "empty but for Weinstein."[33]

c.      Weinstein sexually assaulted dancer Ashley Matthau when he visited the set of Miramax's *Dirty Dancing: Havana Nights* in Puerto Rico in 2004.[34] He ordered her into a car that took her to his hotel room, where he attacked her after she declined his suggestion that she follow the lead of other high profile actresses whose careers he had launched by sleeping with him.[35]

d.      After Lena Heady appeared in a TWC film, Weinstein harassed her in 2005 at the Venice Film Festival, but Heady tried to laugh it off at the time. Years later, after a breakfast work meeting in a Los Angeles hotel, Weinstein told Heady to come to his hotel room to pick up a script. In the elevator, the energy shifted, causing Headey to warn Weinstein not to expect anything physical. She described that Weinstein went silent, apparently furious at her words. Weinstein's hand was on Heady's back, marching

---

[32] *Id.*

[33] *Id.*

[34] Ellen Gabler *et al.*, *New Accusers Expand Harvey Weinstein Sexual Assault Claims Back to '70s*, N.Y. TIMES (Oct. 30, 2017), https://www.nytimes.com/2017/10/30/us/harvey-weinstein-sexual-assault-allegations.html.

[35] *Id.*

her forward, while she felt completely powerless. When his key card didn't work,

Weinstein got very angry. Weinstein then walked her back downstairs and paid for a car

to take her away from the hotel, whispering in her ear not to tell anyone about the

incident.[36]

      e.     When Rosanna Arquette showed up for dinner at a hotel restaurant with

Weinstein, she was told to meet him in his room.[37]

      f.     When Jessica Barth arrived at the Peninsula Hotel for a business meeting,

Weinstein told her on the phone to come to his room.[38]

      g.     When Ashley Judd arrived at the Peninsula Hotel for a business meeting,

she was told to meet him in his room.[39]

      h.     After a breakfast meeting with Weinstein and a female executive, the

female executive left, leaving Judith Godrèche alone with Weinstein, who told her to join

him in his room to discuss the Miramax film's marketing and an Oscar campaign.[40]

      i.     When Dawn Dunning arrived at the hotel for a meeting, she was told that

Weinstein's earlier meeting was running late and to go to his suite.[41]

    62.     *Once isolated, Weinstein battered, assaulted, or attempted to assault the women:*

---

[36] Joyce Chen, *Lena Headey of 'Game of Thrones' Alleges Harvey Weinstein Sexual Harassment*, ROLLING STONE (Oct. 18, 2017), https://www.rollingstone.com/movies/news/game-of-thrones-lena-headey-alleges-weinstein-harassment-w509515.

[37] Farrow, *supra* note 10.

[38] *Id*.

[39] Kantor & Twohey, *supra* note 1.

[40] Kantor & Abrams, *supra* note 13.

[41] *Id*.

a.     Rose McGowan: In a hotel room in 1997, ". . . HW raped me."[42]

b.     Lucia Stoller: "'He forced me to perform oral sex on him.' As she objected, Weinstein took his penis out of his pants and pulled her head down onto it. 'I said, over and over, "I don't want to do this, stop, don't.'"[43]

c.     Asia Argento: Weinstein left the hotel room and returned "wearing a bathrobe and holding a bottle of lotion. 'He asks me to give a massage. I was, like, "Look, man, I am no f***** fool."'" "[A]fter she reluctantly agreed to give Weinstein a massage, he pulled her skirt up, forced her legs apart, and performed oral sex on her as she repeatedly told him to stop." [44]

d.     Mira Sorvino: In 1995, while Sorvino was at the Toronto International Film Festival promoting the Miramax-produced *Mighty Aphrodite*, she found herself in a hotel room alone with Weinstein. Weinstein started massaging her shoulders and then chased her around the room.[45]

e.     Sophie Dix: Weinstein masturbated in front of her after Dix said "no a thousand times," causing Dix to lock herself in the bathroom.[46]

---

[42] Holly Christodoulou, *'I told you he raped me,'* THE SUN (Oct. 13, 2017), https://www.thesun.co.uk/news/4673738/rose-mcgowan-harvey-weinstein-rape-claims-amazon-jeff-bezos/, *quoting* tweet from Rose McGowan.

[43] Farrow, *supra* note 10.

[44] *Id.*

[45] *Id.*

[46] *Id.*

      f.      Emma de Caunes: Weinstein went into the hotel bathroom, turned on the shower, returned naked with an erection, and demanded she lie on the bed.[47]

      g.      Rosanna Arquette: Weinstein answered his hotel door in a bathrobe, tried to force Arquette to give him a neck massage, and pulled her hand toward his erect penis.[48] After Arquette refused Weinstein's unwanted sexual advances, the role she wanted in a Miramax movie went to somebody else.[49]

      h.      Jessica Barth: Weinstein demanded a naked massage in his bed.[50]

      i.      Ashley Judd: Weinstein appeared in a bathrobe, asking if he could give her a massage or she could watch him shower.[51] Describing her fear and panic at being propositioned by Weinstein, Judd said, "There's a lot on the line, the cachet that came with Miramax."[52]

      j.      Gwyneth Paltrow: Weinstein touched her, suggesting they head to his bedroom for massages.[53]

      k.      Angelina Jolie: Weinstein made unwanted advances on her in a hotel room.[54]

---

[47] *Id.*

[48] *Id.*

[49] Kantor & Abrams, *supra* note 13.

[50] Farrow, *supra* note 10.

[51] Kantor & Twohey, *supra* note 1.

[52] *Id.*

[53] Kantor & Abrams, *supra* note 13.

[54] *Id.*

l.      Judith Godrèche: After Godrèche declined to give him a massage, "he's pressing against me and pulling off my sweater."[55]

m.      Dawn Dunning: Weinstein, who had worn a bathrobe for their meeting, told Dunning that he had contracts for her for his next three films, but that she could only sign them if she would have three-way sex with him. When Dunning laughed, assuming Weinstein was joking, Weinstein became angry, stating: "You'll never make it in this business. This is how the business works."[56]

n.      Daryl Hannah: On multiple occasions, Weinstein tried to barge into her hotel room at night; she escaped out back doors; she used furniture to bar the door; and she had her male make-up artists present when Weinstein was able to secure a key to her room without her consent. *The New Yorker* reported: Weinstein "'had a key,' when Hannah was in Rome for the Italian premiere of Miramax's Kill Bill: Volume 2. Hannah recalled. 'He came through the living room and into the bedroom. He just burst in like a raging bull. And I know with every fiber of my being that if my male makeup artist was not in that room, things would not have gone well. It was scary.' [Hannah's make-up artist] remembered the incident vividly. 'I was there to keep her safe,'" he told *The New Yorker*.[57]

---

[55] *Id.*

[56] *Id.*

[57] Ronan Farrow, *Weighing the Costs of Speaking Out About Harvey Weinstein*, THE NEW YORKER (Oct. 27, 2017), https://www.newyorker.com/news/news-desk/weighing-the-costs-of-speaking-out-about-harvey-weinstein.

010717-11/1104435 V2

o.      Weinstein sat next to Amber Battilana Gutierrez on the couch in the TWC offices and began staring at her breasts, asked if they were real, and "lunged" at her, groping her breasts and attempting to put his hand up her skirt.[58]

p.      Paz de la Huerta—first rape: In November 2010, Weinstein offered de la Huerta a cab ride home after bumping into her at a hotel bar in New York and then demanded to come in for a drink: "'Immediately when we got inside the house, he started to kiss me and I kind of brushed [him] away,' de la Huerta said. 'Then he pushed me onto the bed and his pants were down and he lifted up my skirt. I felt afraid . . . It wasn't consensual . . . It happened very quickly . . . He stuck himself inside me. . . . When he was done he said he'd be calling me. I kind of just laid on the bed in shock.'"[59]

q.      Paz de la Huerta—second rape: In December 2010, Weinstein showed up in her building lobby after she came home from a photo shoot: "'He hushed me and said, "Let's talk about this in your apartment,"' de la Huerta said. 'I was in no state. I was so terrified of him . . . . I did say no, and when he was on top of me I said, "I don't want to do this." He kept humping me and it was disgusting. He's like a pig . . . . He raped me.'"[60]

63.     These were not isolated instances, but the practiced role and pattern of a sexual predator.

---

[58] *Id.*

[59] Rebecca Keegan, *Paz de la Huerta Says Harvey Weinstein Raped Her Twice. Will That Bring Him to Justice?*, VANITY FAIR (Nov. 2, 2017), https://www.vanityfair.com/hollywood/2017/11/paz-de-la-huerta-harvey-weinstein-allegations (alterations in original).

[60] *Id.* (alterations in original).

D.     **Like many of the Class members, Plaintiff Jill Doe was assaulted while Weinstein worked for TWC (2016-17).**

64.     In 2016, Jill Doe was an aspiring actress and filmmaker in New York City. In or about April 2016, she met Harvey Weinstein at a gala just as she was about to graduate from college.

65.     Jill Doe had just finished her first short film which had been accepted into several international film festivals. Weinstein gave Jill Doe his business card and told her he wanted to watch her film. Jill Doe was flattered to receive that kind of recognition from the most powerful producer in show business.

66.     After he watched her film, Harvey Weinstein asked her to meet him during the daytime at a public place. The meeting was professional. Weinstein gave Jill Doe critiques, but overall was positive about the film. And, he was encouraging. Jill Doe told him about another script she was getting ready to film. He asked to see it, so she sent it to him.

67.     The next day Weinstein called Jill Doe to meet to discuss the script. They met the next week, during the day, for coffee. Weinstein told Jill Doe he "loved her mind," he thought she was intelligent, different, and more sophisticated than other girls he met.

68.     Weinstein continued this pattern for several weeks. Weinstein or his TWC assistants would call or email Jill Doe and tell her where to meet him. He met with Jill Doe for coffee or lunch (many times at the Tribeca Grill), instructed her to watch certain films, and gave her instructions for scripts she should write, or lists of books she should read.

69.     Weinstein or his TWC assistant would call her up and say that there was a play she must see and that there would be a ticket waiting for her at the box office (and she would attend alone).

70.     As the 2016 Cannes Film Festival approached, Weinstein repeatedly told Jill Doe that he would include her in all events and meetings at the festival.

71.     One evening, before Cannes, Weinstein invited Jill Doe to an event along with other TWC employees where a world-renowned musician was performing. After the performance, Weinstein took Jill Doe backstage and introduced her to the musician's manager, and talked to her about working with TWC and the musician on an upcoming production.

72.     The week after meeting the musician, Weinstein told Jill Doe they were meeting the musician and his manager for dinner at the Tribeca Grill. Weinstein and Jill Doe went to the Tribeca Grill to wait for them. Jill Doe had a glass of wine with Weinstein, and eventually became uncomfortable. As it was getting late, Jill Doe started getting the eerie feeling that no one else was coming.

73.     Suddenly, Weinstein said he had forgotten his iPad in a hotel room at the Greenwich Hotel next door. "Come, just come. It'll be quick. We'll be right back," Weinstein said to Jill Doe.

74.     In the hotel room, Jill Doe lingered in the doorway as Weinstein went about "looking" for his iPad.

75.     Weinstein went into the bathroom. He came out half naked, and asked Jill Doe for a massage. Jill Doe was immediately panicked, wondering what she had done to make him think this is what she wanted. He maneuvered her into the bedroom. She said no, she would not give him a massage, but he insisted and laid down on the bed. She reluctantly gave him a shoulder massage, thinking she might be able to get out of there relatively unscathed if she gave him a quick massage.

76.     Weinstein then sat up and forced his hands on her shoulders, telling her to relax and that he wanted to give her a massage. Jill Doe resisted, and said she did not want a massage. Weinstein insisted Jill Doe did want him to and told her to take off her sweater. When Jill Doe said no, Weinstein forcibly removed it.

77.     Weinstein was three times Jill Doe's size, and used his size to maintain control of her. She was scared. She knew she was not strong enough to fight him. Weinstein pushed Jill Doe down on the bed. She told him no and to stop; he kept telling her to relax, that she wanted this.

78.     Weinstein pulled down Jill Doe's pants and her underwear despite her protests. He held her down and performed oral sex on her. When he would not let her up or listen to her protests, Jill Doe froze. Weinstein continued until he eventually got tired of it and then sat up.

79.     Jill Doe sat up too. She wanted to leave, to run out. But Weinstein grabbed her wrist, said "come" and pulled her down so that her head was between his legs. He tightly held her shoulder so she could not get away. When Jill Doe said no, Weinstein told her, again, that yes, she wanted to do this.

80.     After she gagged and did not perform what he wanted, Weinstein told her to get up, and pulled her into the bathroom where he stood behind her, masturbated, and ejaculated.

81.     Jill Doe was in shock. She was confused and felt betrayed. And even though Jill Doe had not consented or reciprocated in any way, she felt disgusted, dirty, and nauseous.

82.     Traumatized, Jill Doe does not recall how she got home that night.

83.     The next day, Weinstein called Jill Doe and asked her to meet him. She was afraid to say no or to not answer him. She hoped that because she had rejected him, they would resume their mentor-mentee relationship. She agreed to meet him in the hotel lobby.

84.    When Jill Doe arrived, Weinstein gave her a present of luggage for the trip to the Cannes Film Festival. He told her not to tell anyone what happened the night before. He also told her "Cannes this year will be a big year for you."

85.    Weinstein arranged for Jill Doe to attend a dinner for a renowned actor her first night at Cannes. Weinstein introduced Jill Doe to a woman named Charlotte, who she understood worked for TWC. The next day, Weinstein told Jill Doe to come to the restaurant at the Majestic Hotel to meet with an agent. When she arrived, Charlotte was there. The agent never showed up.

86.    At the meeting, Weinstein told Jill Doe that Charlotte knew about their "relationship." Weinstein said Charlotte wouldn't tell anyone, "right Charlotte?" Charlotte nodded, stating: "No, of course not." Weinstein told Jill Doe she should contact Charlotte if she ever needed anything. Jill Doe was scared. She felt like Weinstein and "Charlotte" were implicitly threatening her, making sure she knew that she had no power.

87.    After Cannes, Weinstein pushed Jill Doe to take a meeting with an agent in London, which she did.

88.    Throughout this period, Weinstein was asking Jill Doe to write a feature film for him and to create a series.

89.    Weinstein manipulated Jill Doe into believing that he controlled her success as an actress and a filmmaker. She believed that in order to pursue her career, she had to meet with him, to have a professional relationship with him. Weinstein pretended to be her mentor who would give her advice and access to the industry.

90.    But, for nine months, over her protests, he manipulated her into doing things she did not want to do.

010717-11/1104435 V2

91.     Weinstein insisted constantly that she should have sex with him. When she refused (which she always did), he would make fun of her, calling her prudish. He would describe the sexual experiences he had with famous actresses, telling Jill Doe she should be more free and willing like them.

92.     Weinstein abused, objectified and humiliated Jill Doe, requiring her on many occasions to stand naked in front of a mirror, while he stood naked close behind her, and masturbated.

93.     He forced her to fellate him, touch his penis, and allow him to touch her. No matter how she told him she did not want to do anything, he would persist.

94.     Jill Doe was scared to speak out. She was scared that this powerful producer would block the release of her films and blacklist her.

95.     But, even through the abuse, Jill Doe protested. She still replays the horrible moments in her mind when she mustered up the courage to say to Weinstein: "Stop . . . I don't want this, I don't want to do this." On some occasions, he would act as if he understood what she was saying, but then still made her stand there while he finished masturbating. On other occasions, he became extremely hostile, reprimanding her, calling her names, and asking what was wrong with her.

96.     Jill Doe recalls seeing discarded syringes and needles in the bathroom at Cannes when Weinstein abused her there. At the time, she thought he might be diabetic. Now, she understands those injections were of his erectile dysfunction medication he would use before abusing his targets.

97.     Jill Doe developed anxiety attacks that came on randomly. She isolated herself. She compartmentalized the abuse to survive it. The abuse disgusted her, but she had no idea how to stop it.

98.     On one occasion while Weinstein was masturbating in front of the mirror, Jill Doe was completely numb and passive. Weinstein told Jill Doe that he saw how much his actions hurt her and how much she didn't enjoy it. He promised he was never going to abuse her again.

99.     A few weeks later, Weinstein invited Jill Doe out for coffee. She thought, "ok, I can go to this because I'm safe now, he promised me." When she arrived, there was another woman present to whom Jill Doe had previously been introduced. Weinstein demanded they both "take care of him" together. He demanded both women take off their clothes. Jill Doe felt extremely embarrassed, betrayed and disrespected. She refused to take off her clothes and left.

100.    In January 2017, Jill Doe confided in her mom about the abuse. She told her mom everything. She had never told anyone before out of fear. Loving and caring, Jill Doe's mom helped Jill Doe extract herself from the abuse.

101.    Nonetheless, Weinstein continued to contact Jill Doe. On some occasions he would call her at 11 p.m., demanding a massage. She did not participate. In late spring 2017, Weinstein contacted Jill Doe, demanding to know whether she had told her story to an investigative journalist with whom she was friends. She said she had not. He then demanded to know whether she had told anyone else. She said no. He made clear she was not to tell anyone what he had done to her. He then hung up.

102.    Weinstein's assaults and pattern of abuse have physically and emotionally traumatized Jill Doe. She has suffered and continues to suffer severe emotional distress, and has been damaged.

E. **Officers, Directors, and Employees of TWC facilitated, had knowledge of, or should have known of Weinstein's predatory behavior.**

1. **Harvey Weinstein's employment contracts, approved by the Board, served to insulate him from recourse for sexual misconduct.**

103.     Harvey Weinstein's first five-year contract, which began in 2005 ("2005 Contract"), stipulated that Weinstein could only be terminated for two types of offenses. The first was a conviction for a felony involving "moral turpitude." While being accused of assault or even sexual harassment would normally cause a Board to conduct a serious investigation, the Board hid behind the agreement claiming it couldn't do anything absent a *conviction*.[61] The second type of offense was for the misuse of corporate funds, but for which Weinstein would be granted a cure period.

104.     The 2005 Contract also mandated that all subsequent employment contracts incorporate at least "equal or better terms." Accordingly, when it expired in 2010, Harvey Weinstein received a second five-year contract with the same favorable safeguards ("2010 Contract").

105.     When the 2010 Contract was up for renewal in 2015, the negotiations were left to the compensation committee – which was comprised of Maerov and Jeff Sackman. Sackman resigned in the midst of the negotiations.[62]

---

[61] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[62] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

- 34 -

106.    Director Maerov thus took the lead in negotiating Weinstein's 2015 contract. According to Maerov, his chief concern was whether Weinstein's behavior posed a threat of legal liability for the business.[63]

107.    As to sexual assault, according to Director Maerov: "He had to be *convicted* of a felony, and not just any felony, only one involving moral turpitude. If we'd had documentary evidence of sexual harassment, the absurdity of his old contract still would have prevented us from terminating him." [64]

108.    The contract provides that if TWC was obligated to make a payment to satisfy a claim that Weinstein "treated someone improperly in violation of the company's Code of Conduct," he must reimburse TWC for settlements or judgments. Additionally, "You and the Company recognize that, in addition to being indemnified for the amount of payments the Company is obligated to make as a result of your misconduct, such misconduct can cause significant damage to the Company which is difficult or impossible to measure. Accordingly, if your misconduct results in the Company making an Obligated Payment to a person damaged by such misconduct, in addition to the indemnification set forth in subparagraph i.(a), you will pay the company liquidated damages of $250,000 for the first such instance, $500,000 for the second such instance, $750,000 for the third such instance, and $1,000,000 for each additional instance."[65] The Code of Conduct, adopted in September 2015, provides for standard violations

---

[63] Megan Twohey, *Weinstein Company Was Aware of Payouts in 2015* , N.Y. TIMES (Oct. 11, 2017), https://www.nytimes.com/2017/10/11/business/weinstein-company.html

[64] Tully, *supra* note 7.

[65] Oct. 20, 2015 Employment Agreement ("Employment Agreement")) ¶ 11 (i)(i)(b), attached as Exhibit B.

such as "sexual harassment," "intimidating or threatening behavior," and receiving "a personal benefit as a result of the employee's position with TWC." [66] Weinstein and TWC further agreed that Weinstein's payment "constitutes a 'cure' for the misconduct and no further action can be taken."[67]

109.    These provisions in an employment contract are unique—and reflect TWC's knowledge that Weinstein had in the past engaged in, and therefore was more likely than not to engage in, sexual harassment and other misconduct affecting the Class and female employees.

110.    TWC is liable for Weinstein's conduct, because it was perpetuated within the scope of his employment, and even permitted Weinstein a "cure" if he persisted on that course of conduct.

111.    On October 5, 2017, The New York Times published the story. That evening, all nine directors – including Harvey Weinstein, Robert Weinstein, Lance Maerov, Tarak Ben Ammar, Paul Tudor Jones, Dirk Ziff, Marc Lasry, and Tim Sarnoff – met via conference call. During the telephone call, Harvey insisted that the stories were not true. Nonetheless, Harvey agreed to a temporary leave of absence. However, he insisted that the telephone call did not count as an official board meeting, and that the Board had no legal authority to remove him.[68]

112.    Jones also expressed doubts on the Board's ability to legally remove Harvey. Jones stated that terminating Harvey could be viewed by lenders as a "material event," triggering a debt default by TWC.[69]

---

[66] Tully, *supra* note 7.

[67] Employment Agreement (Exhibit B) ¶ 14.

[68] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[69] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

113.     On October 6, 2017, Dirk Ziff, Marc Lasry, and Tim Sarnoff resigned as Board members.

114.     That evening, four Board members issued a release stating that Harvey Weinstein was taking "an indefinite leave of absence," adding that "it's important for him to get the professional help for the problems he has acknowledged." The board also announced an independent investigation. Jones did not sign the release. Rather than independently condemn the assault allegations, Jones sent an email on October 6, 2017 to Maerov, stating: "At this time I would prefer NOT to sign it as the last paragraph about Bob taking control implies levels of legality and board authority that I don't fully comprehend or understand. Respectfully, Paul"

115.     On October 7, 2017, Jones sent Harvey an email, telling him: "I love you." Jones encouraged him to "Focus on the future as America loves a great comeback story," and stated: "The good news is, this will go away sooner than you think and it will be forgotten!"

116.     Jones resigned from the Board on October 7, 2017.

117.     On Sunday, October 8, 2017, the Board met again, and voted to terminate Harvey.

118.     After the sale of TWC in bankruptcy, Robert Weinstein, Ben Ammar and Maerov resigned on July 13, 2018.

### 2.     Employees of TWC often aided and abetted Weinstein in the commission of his sexual misconduct.

119.     Female employees of TWC—including Carroll—were often used to make Weinstein's victims feel safe. The employees would initially join a meeting along with a Class member or woman in whom Weinstein was interested. Weinstein would dismiss the employee, leaving him alone with his female target.[70]

---

[70] Farrow, *supra* note 10.

120.    Sixteen current and former executives and assistants at TWC told a reporter from *The New Yorker* about a pattern of professional meetings that were pretexts for sexual advances on young actresses and models. "All sixteen said that the behavior was widely known within both Miramax and the Weinstein Company."[71]

121.    Weinstein also required multiple groups of TWC employees to facilitate his sexual encounters with women. In part, Weinstein required executive assistants to schedule and help arrange sexual (or possible sexual) encounters for him, even directing them to essentially badger women who refused or expressed reluctance into accepting a "meeting" with him. Additionally, on multiple occasions, Weinstein required junior executives to meet a woman and discuss working in the entertainment industry generally or on specific TWC projects, because he was interested in her sexually and wanted the executives to help put the woman at ease before he made any sexual advances or because she had already submitted to his advances.[72]

122.    Female assistants at TWC were also required to procure Weinstein's erectile dysfunction shots, one of whom received a bonus for obtaining them and was at times directed to administer the injections. Other TWC witnesses described ensuring that Weinstein had an adequate supply of erectile dysfunction shots in his travel bags at all times. Some were tasked with preparing a private room at TWC where Weinstein was to have sexual encounters, and then cleaning up the room when the encounters were over. They occasionally found articles of women's clothing that had been left behind.[73]

---

[71] Farrow, *supra* note 10.

[72] Verified Petition ¶ 25, *People v. The Weinstein Company LLC et al.*, No. 0450293/2018 (N.Y. Sup. Ct. Feb. 11, 2018).

[73] *Id.* ¶ 45.

123.    Irwin Reiter, the Executive Vice President of Accounting and Financial Reporting at TWC from 2005 to the present, who previously worked in the same capacity at Miramax from 1989 to 2005,[74] sent messages to Emily Nestor, a temporary employee of TWC, who alleged that she was harassed, describing Weinstein's "mistreatment of women" as an ongoing problem.[75]

124.    A female executive told *The New Yorker*: "There was a large volume of these types of meetings that Harvey would have with aspiring actresses and models." "He would have them late at night, usually at hotel bars or in hotel rooms. And, in order to make these women feel more comfortable, he would ask a female executive or assistant to start those meetings with him."[76]

125.    A female employee at TWC, Lauren O'Connor, wrote in a 2015 memo obtained by *The New York Times* that Weinstein required her to schedule casting discussions with aspiring actresses after they had private appointments in his hotel room. "She suspected that she and other female Weinstein employees, she wrote, were being used to facilitate liaisons with 'vulnerable women who hope he will get them work.'"[77] However, in a settlement, O'Connor was required to submit a letter saying that she had had a good experience at the company which the Board then used as proof that there was nothing to investigate.

---

[74] https://www.linkedin.com/in/irwin-reiter-58828a4/.

[75] Farrow, *supra* note 10.

[76] *Id*.

[77] Kantor & Twohey, *supra* note 1.

**3.      Director Robert Weinstein (October 21, 2005–July 13, 2018) knew or should have known that Harvey Weinstein was a serial sexual predator.**

126.    Defendant Robert Weinstein was well aware of his brother's pattern of using his power to coerce and force young women to engage in sexual acts with him. Robert and Harvey Weinstein formed Miramax together in 1979.

127.    Robert Weinstein knew or should have known that his brother was a danger to Plaintiffs and the Class members, given that he:

a.      witnessed his brother's physically and verbally abusive behavior;

b.      attended meetings with Harvey and other Miramax executives and employees while Harvey was wearing only a bathrobe or underwear;

c.      knew that Harvey was serially targeting women for sex;

d.      saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

e.      received direct and indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

f.      personally paid £ 250,0000 to settle claims by a woman that was sexually assaulted by Harvey and her colleague who reported it;

g.      knew of and authorized Miramax and TWC to make payments to settle claims by women who were sexually assaulted by Weinstein;

h.      knew that TWC paid Boies Schiller, Kroll and other enterprise participants and should have known the purpose was to cover up Harvey's pattern of assault.

128.    During his time at Miramax, Robert Weinstein paid— using his personal funds— several of Harvey Weinstein's victims to stay silent and release their claims. He was also aware that Miramax funds were used to pay Harvey Weinstein's victims.

- 40 -

129.    Robert Weinstein knew that Harvey Weinstein's pattern of assault was a problem, but deliberately chose to cover it up and pretend it wasn't happening.

130.    For example, when he started dating Ivana Lowell, who was the Vice President of the book division at Miramax in the 1990s, Robert Weinstein asked if she had slept with his brother, and she responded "no, but not for want of him aggressively trying, and all the other women . . . ," at which point Robert cut her off and said: "No, I don't want to know."[78] (Books overseen by Lowell at Miramax were published by Disney's Hyperion division after Disney purchased Miramax).

131.    Kathy DeClesis, Robert Weinstein's assistant in the early 1990s at Miramax stated to *The New York Times*: "It [Weinstein's harassment of women] wasn't a secret to the inner circle,"[79] which included Robert Weinstein.

132.    In fact, DeClesis confronted Robert Weinstein directly about the fact his brother was sexually harassing actresses and female employees throughout their working career together. In one example, a young female employee quit abruptly after an "encounter" with Harvey Weinstein, reportedly "fleeing so quickly that she never claimed the extra shoes under her desk." DeClesis has stated she personally handed Robert Weinstein a demand letter from the woman's lawyer, telling Robert Weinstein: "Your brother is a pig."[80]

---

[78] "Former Miramax Executive Describes Working for Harvey Weinstein as a 'Madhouse,'" Inside Edition (October 17, 2017), available at https://www.youtube.com/watch?v=ULejo9adUqg  (last accessed September 22, 2018).

[79] Kantor & Twohey, *supra* note 1.

[80] http://www.vulture.com/2017/10/bob-weinstein-ex-assistant-he-knew-about-harvey-decades-ago.html

133.    While Robert Weinstein says he "did not know the extent" of his brother's actions, he knew enough to pay personal funds to settle sexual assault claims on his brother's behalf and obtain releases for himself from Harvey's victims.

134.    Robert Weinstein personally paid £250,000 — equivalent to about $600,000 today — to settle two claims against Miramax, himself, and his brother in 1998. The money was split between Harvey's former assistant Zelda Perkins and another female employee in the U.K.

135.    Perkins told investigators from the Women and Equalities Committee of the U.K. Parliament that she left her job after Weinstein "sexually assaulted and attempted to rape a colleague of mine" at the Venice Film Festival in 1998.[81]

136.    Robert Weinstein's claim that he believed Harvey Weinstein had consensual relationships and the women were black-mailing him is not credible. Robert Weinstein's attempt to deflect knowledge is not credible because Miramax Film Corp. and Robert Weinstein were parties to the settlement agreements. And Miramax lawyers, including Mark Mansell at Allen & Overy, were involved in the negotiations with the two women.

137.    Zelda Perkins and Miramax Film Corp. entered a settlement agreement dated October 23, 1998, as well as a letter agreement dated October 23, 1998 concerning tax reporting.[82]

138.    First, the settlement agreement expressly provided:

---

[81] https://www.theguardian.com/film/2018/mar/28/harvey-weinstein-assistant-zelda-perkins-i-was-trapped-in-a-vortex-of-fear

[82] Excerpts of the agreements were submitted to the Women and Equalities Committee of the U.K. Parliament and can be found at https://www.parliament.uk/documents/commons-committees/women-and-equalities/Correspondence/Zelda-Perkins-SHW0058.pdf (last accessed September 28, 2018.

a. The agreement was entered on behalf of "the Company," which was Miramax Film Corp.;

b. The released parties included, among others, Miramax and its officers, explicitly including Harvey Weinstein and Robert Weinstein;

c. The Company would advise new employees about its human resources policies and the existence of three complaint handlers.[83]

139. Second, the agreement expressly acknowledged that Miramax was aware of "the conduct alleged by you that led to the termination of your employment," i.e. her constructive discharge, and that Perkins may need to seek treatment from a medical practitioner as a result. However, the agreement muzzled Perkins on the ability to disclose Harvey or Robert Weinstein's names to any medical practitioner.[84]

140. Finally, as part of the agreement, Harvey Weinstein agreed to attend therapy, and Miramax was required to dismiss Weinstein if there were any further complaints (although it never did despite additional subsequent complaints).[85]

141. Moreover, the letter agreement expressly provided that the £125,000 she received was for "compensation for loss of office from my employers Miramax Film Corp. This was paid to me on behalf of my employer by solicitors Allen & Overy." [86]

---

[83] *Id*.

[84] *Id*.

[85] https://www.theguardian.com/film/2018/mar/28/harvey-weinstein-assistant-zelda-perkins-i-was-trapped-in-a-vortex-of-fear; https://www.bbc.com/news/av/entertainment-arts-42420389/harvey-weinstein-s-former-personal-assistant-zelda-perkins-speaks-to-bbc

[86] Excerpts of the agreements were submitted to the Women and Equalities Committee of the U.K. Parliament and can be found at https://www.parliament.uk/documents/commons-committees/women-and-equalities/Correspondence/Zelda-Perkins-SHW0058.pdf  (last accessed September 28, 2018.

142.    The settlement's requirement that Miramax provide a commitment that Harvey Weinstein would undergo therapy and that a proper human resources complaint procedure would be implemented could not have been agreed to or implemented without Robert Weinstein's assent.

143.    Despite Robert Weinstein's personal and Miramax's corporate knowledge of the settlement agreement with Miramax, Robert Weinstein did not take any action or implement any of the required terms of the settlement that could have prevented additional sexual assaults by Harvey Weinstein. Nor did Robert Weinstein or Miramax take any action against Harvey Weinstein when they learned of additional complaints about Harvey's conduct.

144.    In fact, one year later, in or about May 1999, Perkins ran into Harvey Weinstein at the Cannes Film Festival, where he told her that everything she "had done was pointless."[87]

145.    Finally, what Robert Weinstein admits to knowing is sufficient to demonstrate actual or constructive knowledge: according to The Hollywood Reporter, Robert Weinstein stated in response to the 2017 reports regarding his brother: "'I'll tell you what I did know,' Robert Weinstein said. 'Harvey was a bully, Harvey was arrogant, he treated people like sh*t all the time. That I knew. And I had to clean up for so many of his employee messes. People that came in crying to my office: 'Your brother said this, that and the other.' And I'd feel sick about it.'"[88]

---

[87] Jill Lawless, "Ex-Weinstein assistant says she tried to stop him in 1998" (Associated Press Mar. 27, 2018), available at https://apnews.com/2036175b01ff44d8b1ba38b81037a7db  (last accessed Sept. 28, 2018).

[88] https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905

146.     As reflected above, Robert Weinstein had knowledge throughout the time he was at Miramax of his brother's pattern of sexual misconduct. However, he nonetheless joined with his brother to found TWC in 2005.

147.     As Co-Chairman and a Director of TWC, Robert Weinstein had access to Harvey Weinstein's personnel file, which contained complaints regarding sexual harassment and abuse by Harvey Weinstein.

148.     In 2005, Robert Weinstein was aware that, on the red carpet for the 2005 Comedy Central celebrity roast of Pamela Anderson, Courtney Love was asked to give advice to young actresses coming to Hollywood. Love stated: "I'll get libeled if I say it . . . If Harvey Weinstein invites you to a private party in the Four Seasons, don't go."[89]

149.     Robert Weinstein was aware of and received complaints from women about being sexually harassed or abused throughout the life of TWC.

150.     In 2010, Robert Weinstein's former girlfriend Ivana Lowell published a book entitled "Why Not Say What Happened? A Memoir." She describes an event that took place in or about 1991. She wrote:

> I KNEW ABOUT HARVEY'S REPUTATION as a womanizer; tales of his trying to seduce every young actress in town were infamous. However, I wasn't quite prepared for being on the receiving end of his onslaught.

She described being chased around his desk in the Miramax office on multiple occasions.[90]

---

[89] https://www.youtube.com/watch?v=NkJ63e5Ld0w (last accessed Sept. 21, 2018). MacFarlane recently explained the "joke" was intended to be a "hard swing" at Weinstein based on actress Jessica Barth's account of her encounter with Weinstein. https://www.youtube.com/watch?v=G2AIIHqjm8M (last accessed Sept. 21, 2018).

[90] Ivana Lowell, "Why Not Say What Happened? A Memoir," at 113-116 (all caps in original).

151.    Lowell also described one evening where Harvey Weinstein showed up late at night at her apartment she shared with her roommate who was also a Miramax employee. He laid down on a bed, spread-eagled and groaned: "Which one of you girls is giving me a back massage?"[91]

152.    Even if Robert Weinstein could pretend not to recall when Lowell tried to tell him what happened when they were dating, Robert Weinstein was aware Lowell published a book in 2010 that included a truncated narrative of her experiences with him and his brother.[92] In fact, Lowell disclosed in a 2017 Facebook post that, when the book was published in 2010, Robert Weinstein admitted he was aware of the disclosures:

> "When my book was first published, Harvey called me up, screaming, and said that I made him look like a pervert. I replied 'Yes, so?' " Ivana posted on Facebook.
>
> "He threatened to sue me, and then both Harvey and [younger brother] Bob called me a liar."[93]

153.    Robert Weinstein's quick dismissal of Lowell as a liar was not precipitated by an investigation of the prior events, nor an investigation of whether his brother's attempts "to seduce every young actress in town" continued while at TWC.

---

[91] Ivana Lowell, "Why Not Say What Happened? A Memoir," at 113-116 (all caps in original).

[92] On October 11, 2017, Lowell stated: "I left out a lot of sordid details because I still considered Bob a friend and I didn't realize the extent and consequences of Harvey's sickening ways. This whole thing has left me reeling." Richard Johnson, Weinstein staffer called him out years ago in memoir, Page Six (October 11, 2017), available at https://pagesix.com/2017/10/11/weinstein-staffer-outed-him-years-ago-in-memoir/ (Last accessed September 27, 2018).

[93] Richard Johnson, Weinstein staffer called him out years ago in memoir, Page Six (October 11, 2017), available at https://pagesix.com/2017/10/11/weinstein-staffer-outed-him-years-ago-in-memoir/ (Last accessed September 27, 2018).

154.     According to Robert Weinstein, he was well aware that his brother engaged in verbal and physical abuse. Yet, he "tolerated" his brother's behavior because he was more interested in profits than the assaults. Rather than take actions to help or protect the victims, Robert Weinstein has admitted that he just told people to "leave." And he himself moved to Los Angeles to run the TWC office there so he would not have to take action. However, moving does not absolve Robert Weinstein of liability.

155.     While Robert Weinstein said that, he "divorced" his brother "literally" in 2012 – he did not terminate him from TWC or take any action to protect the class. Rather, Robert Weinstein focused only on how Harvey Weinstein's abuses and misconduct affected him personally. In a dereliction of his duties. Robert Weinstein explained: "…those that know me personally in [TWC] understood how I could not take being around him on any level. And certainly my daughters and my family knew it. *I could not take his cheating*, his lying and also his attitude toward everyone. I had to divorce myself to survive."[94] He "apologize[d] for my own lack of strength at times" in dealing with his brother's abuses.[95]

156.     Robert Weinstein also admitted he was aware of the number of women Harvey Weinstein targeted: "I actually was quite aware that Harvey was philandering with every woman he could meet." He stated: "For me, I thought he was literally just going out there cheating in a pervasive way. It wasn't like he even had a mistress. It was one after another and that I was aware of."[96]

---

[94] https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905 (emphasis supplied).

[95] https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905

[96] https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905

157.     Even though Robert Weinstein was aware of his brother's serial sexual pursuit of women who were required to meet with his brother for business, he did not investigate nor cause an independent investigation of his brother's actions. Robert Weinstein's attempt to deflect knowledge based on assumptions that the "cheating" was consensual is a pretext, given that it is standard for a Board to require a full investigation of such acts and not to take the perpetrator at his word. It is also a pretext given that Robert Weinstein was personally aware of and personally paid for settlements with victims of his brother's assaults.

158.     Robert Weinstein was aware that, in a 2012 episode of 30 Rock, the character Jenna says to Tracy: "I'm not afraid of anyone in show business. I turned down intercourse with Harvey Weinstein on no less than three occasions. [Pause] Out of five."[97] Yet Robert Weinstein did not take action nor cause an independent investigation to be conducted.

159.     According to one of Harvey Weinstein's TWC assistants from February 2013 to February 2015, Sandeep Rehal: "Harvey Weinstein's sexual abuse and conduct, and his use of the office, TWC and staff to enable it, was common knowledge in the office, to management, to his brother Robert Weinstein, and to Frank Gil."[98]

160.     During this period from 2013 to 2015, among other things, Rehal was required to clean Harvey Weinstein's semen off the couch in his TWC office "three or so times a week when Harvey Weinstein was in New York."[99] Rehal alleges that Robert Weinstein was aware of Weinstein's sexual acts in his TWC office.

---

[97] The excerpt of the *30 Rock* episode can be found at https://www.youtube.com/watch?v=0ceNfXrccbQ (last accessed September 27, 2018).

[98] Complaint, ¶ 30, *Sandeep Rehal v. Harvey Weinstein et al*., No. 18 CV 674 (S.D.N.Y.) (Dkt. No. 1).

[99] Complaint, ¶ 30, *Sandeep Rehal v. Harvey Weinstein et al*., No. 18 CV 674 (S.D.N.Y.) (Dkt. 1).

010717-11/1104435 V2

161.    Robert Weinstein was aware of a January 2013 episode of 30 Rock where the character Jenna laments: "In some ways, I'm still pinned under a passed-out Harvey Weinstein and it's Thanksgiving."

162.    Robert Weinstein was aware that, at the 2013 Academy Awards ceremony, Seth MacFarlane, the creator of *Family Guy*, announced the five nominees for best supporting actress when he stated: "Congratulations, you five ladies no longer have to pretend to be attracted to Harvey Weinstein."[100] Yet Robert Weinstein did not take action nor cause an independent investigation to be conducted.

163.    Robert Weinstein was aware of Irwin Reiter's complaints made in November 2013 about Harvey's mistreatment of women, which resulted in Reiter being labeled the "sex police."

164.    Robert Weinstein was aware of a complaint submitted to the human resources department in December 2014 by a male TWC employee regarding sexually-inappropriate behavior directed at Emily Nestor. Robert Weinstein knew that Nestor never pursued the complaint because HR told Nestor that Harvey Weinstein would be informed (and would retaliate) if she pursued the complaint.

165.    Robert Weinstein was aware of an article published by Defamer (a Gawker-owned website) on April 2, 2015 entitled "Tell Us What You Know About Harvey Weinstein's 'Open Secret.'"[101] The exposé "revealed" Harvey "Weinstein's M.O. to be the following: he holds 'casting sessions' at his office on Friday evenings when he can be alone, and that he greets

---

[100] James Hibberd, *Seth MacFarlane explains his Harvey Weinstein joke in emotional post*, ENTERTAINMENT WEEKLY (Oct. 11, 2017), http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/.

[101] http://defamer.gawker.com/tell-us-what-you-know-about-harvey-weinsteins-open-sec-1695071092

women in his bathrobe." Yet Robert Weinstein did not undertake nor cause TWC or the Board to undertake an investigation of Harvey's conduct.

166.    Robert Weinstein received a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room. The memo cited numerous incidents of Weinstein harassing or coercing women into sexual activity and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[102]

167.    Robert Weinstein also knew about the sting conducted by the New York police to obtain a confession from Harvey Weinstein after he assaulted model Ambra Gutierrez. His knowledge of the police sting resulted in his demand, as a Board member in 2015, that Weinstein sign the company's new Code of Conduct. However, he and the Board did not actually require Harvey Weinstein to affirm the Code of Conduct, and dropped their demand after the Manhattan District Attorney declined to press charges.

168.    The Board, including Robert Weinstein, purportedly "relied" on – and hid behind -- Weinstein's account that "the whole incident 'was a setup by a shakedown artist.' The proof, he said, was that he wasn't arrested, and that Gutierrez had signed an affidavit swearing that the alleged groping never occurred. Weinstein told the board that the reason Gutierrez had signed the affidavit was that he'd threatened a defamation suit, showing that her whole story was a sham, say the two directors."[103] Yet neither the Board nor Robert Weinstein conducted an independent investigation, nor requested to see the standard types of documents that would be produced in

---

[102] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

[103] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

such an investigation including correspondence, any settlement agreements, and records of payments.

169.    While the Board could have sued for access to the file, Robert Weinstein and the Board decided not to because he knew it "could have been very damaging to the company."[104] Moreover, the Board's decision was motivated by the fact that Harvey Weinstein "agreed to hold TWC and its directors harmless from any claim, liability, loss, or expense resulting from any incident, resolved or unresolved, disclosed in his personnel file," [105] thus putting their personal interests over their duties as Directors.

170.    After the sting, the Board decided to renew Harvey Weinstein's employment contract.

171.    Robert Weinstein was aware of a book published in 2016 by a producer named Barry Avrich entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended to produce a film about Harvey Weinstein's life but that Weinstein shut it down. Avrich wrote that, during one of his meetings with Harvey to try and persuade him to cooperative, Avrich said to Harvey:

> Harvey, I'm not telling the stories that maybe you think I'm telling. **People have told me some salacious stories**, but I'm not going down that road. This is a film about you and your movies, so you have nothing to worry about.[106]

And Avrich hinted at other sexual improprieties in the book.[107]

---

[104] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[105] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[106] Avrich, "Moguls Monsters and Madmen," at 275 (2016) (emphasis supplied).

[107] *Id.* at 279.

172.     Yet, despite knowledge of the book and its substance in 2016, Robert Weinstein did not conduct an independent investigation or cause TWC or the Board to conduct an investigation of the alleged "salacious conduct" by Harvey Weinstein.

173.     Given the fact that Robert Weinstein (i) personally paid for settlements with his brother's assault victims, (ii) was aware of complaints made by female victims at both Miramax and TWC, (iii) was aware of his brother's physically and verbally abusive behavior, and (iv) was aware that Harvey Weinstein was serially targeting women for sex, Robert Weinstein knew or should have known that his brother was a danger to Plaintiffs and the Class members. [108]

174.     Robert Weinstein also admitted that he was not alone in his knowledge. He stated that he and the Board "begged" Harvey Weinstein to get help for years. In response to witnessing his brother engaging in verbal and physical abuse, Robert Weinstein explained: "I asked him to get help for many years. And that's the truth. He avoided getting the help. We begged him." [109]

**4.     Director Lance Maerov (October 21, 2005–July 13, 2018) knew or should have known that Harvey Weinstein was a serial sexual predator.**

175.     Board Member Lance Maerov knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class. As a Board member of TWC from October 21, 2005 through July 13, 2018, Maerov was responsible for oversight of the Board's Co-Chairman Harvey Weinstein.

176.     Maerov knew or should have known that Harvey Weinstein was a danger to Plaintiffs and the Class because he:

         a.       witnessed Harvey Weinstein's physically and verbally-abusive behavior;

---

[108] https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905

[109] https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905

b. was aware that Weinstein was serially targeting women for sex;

c. saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

d. received direct and indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

e. discussed with other TWC Board members, separately and at Board meetings, complaints about Harvey Weinstein's sexual misconduct;

f. knew of payments made by TWC to settle claims by women who were sexually assaulted by Weinstein;

g. had or should have had access to Harvey's personnel file, which contained complaints about Harvey's misconduct;

g. knew that TWC paid Boies Schiller and other enterprise participants, and knew or should have known the purpose of those payments was to cover up Harvey's pattern of assault.

177. According to Fortune magazine, Maerov "assert[ed] that Weinstein for years bullied and insulted employees, directors, and his brother, squandered outside investors' money, and ran TWC not to earn profits for its outside investors, but as a personal fiefdom that bestowed celebrity and power."[110] Maerov stated that Harvey Weinstein "wasn't interested in running the studio honestly and responsibly. He was running it for his own self-aggrandizement."[111]

---

[110] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[111] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

178.    As a Board member, Maerov had access to Harvey Weinstein's personnel file,

which contained complaints regarding sexual harassment and abuse by Harvey Weinstein.

179.    In fact, according to Maerov, during his tenure as director, he had heard from

TWC employees and others about complaints against Weinstein. [112]

180.    Maerov has admitted that he was aware of settlements with Harvey Weinstein's

victims but assumed "they were used to cover up consensual affairs," as Weinstein "insinuated

that he was a philanderer."[113] Maerov's attempt to deflect knowledge based on assumptions and

insinuations is non-sensical, given that it is standard for a Board to require a full investigation of

such acts and not to take the perpetrator at his word.

181.    Maerov was aware of references on red carpets, television shows, and

publications concerning Harvey Weinstein's sexual misconduct. By way of example:

a.    In 2005, Maerov was aware of a statement made by Courtney Love on the

red carpet of the 2005 Comedy Central celebrity roast of Pamela Anderson about Harvey

Weinstein. When asked to give advice to young actresses coming to Hollywood, Love

said: "I'll get libeled if I say it… If Harvey Weinstein invites you to a private party in the

Four Seasons, don't go." [114]

b.    In 2010, Maerov was aware of a book published by Robert Weinstein's

former girlfriend, Ivana Lowell, titled: "Why Not Say What Happened," in which Lowell

---

[112] Shawn Tully, *How a Handful of Billionaires Kept Their Friend Harvey Weinstein in Power*, FORTUNE (Nov. 24, 2017), http://fortune.com/2017/11/19/weinstein-scandal-board-battles/.

[113] https://www.vanityfair.com/hollywood/2017/10/harvey-weinstein-company-lawyer

[114] https://www.youtube.com/watch?v=NkJ63e5Ld0w (last accessed Sept. 21, 2018).

describes being sexually harassed and chased by Harvey Weinstein in the office, as well as Harvey's M.O. of undressing and demanding a "massage."

      c.     Maerov was aware that, in a 2012 episode of 30 Rock, the character Jenna says to Tracy: "I'm not afraid of anyone in show business. I turned down intercourse with Harvey Weinstein on no less than three occasions. [Pause] Out of five."[115]

      d.     Maerov was aware of a January 2013 episode of 30 Rock where the character Jenna laments: "I know how former lovers can have a hold over you long after they're gone. In some ways, I'm still pinned under a passed-out Harvey Weinstein and it's Thanksgiving."

      e.     In 2013, Maerov was aware that, at the Academy Awards ceremony, Seth MacFarlane, the creator of *Family Guy*, announced the five nominees for best supporting actress and stated: "Congratulations, you five ladies no longer have to pretend to be attracted to Harvey Weinstein."[116]

182.    Maerov was aware of an article published by Defamer (a Gawker-owned website) on April 2, 2015 entitled "Tell Us What You Know About Harvey Weinstein's 'Open Secret.'"[117] The exposé "revealed" Harvey "Weinstein's M.O. to be the following: he holds 'casting sessions' at his office on Friday evenings when he can be alone, and that he greets

---

[115] The excerpt of the *30 Rock* episode can be found at https://www.youtube.com/watch?v=0ceNfXrccbQ (last accessed September 27, 2018).

[116] James Hibberd, *Seth MacFarlane explains his Harvey Weinstein joke in emotional post*, ENTERTAINMENT WEEKLY (Oct. 11, 2017), http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/.

[117] http://defamer.gawker.com/tell-us-what-you-know-about-harvey-weinsteins-open-sec-1695071092

women in his bathrobe." Yet Maerov did not undertake nor cause TWC or the Board to undertake an investigation of Harvey's conduct.

183.    Maerov also knew of Harvey Weinstein's conduct because he received a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room. The memo cited numerous incidents of Weinstein harassing or coercing women into sexual activity and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[118]

184.    Maerov also knew about the sting conducted by the New York police to obtain a confession from Harvey Weinstein after he assaulted model Ambra Gutierrez. His knowledge of the police sting resulted in his demand, as a Board member in 2015, that Weinstein sign the company's new Code of Conduct. However, he and the Board did not actually require Harvey Weinstein to affirm the Code of Conduct, and dropped their demand after the Manhattan District Attorney declined to press charges.

185.    Maerov told Fortune Magazine that the Board relied (or hid behind) on Weinstein's account that "the whole incident 'was a setup by a shakedown artist.' The proof, he said, was that he wasn't arrested, and that Gutierrez had signed an affidavit swearing that the alleged groping never occurred. Weinstein told the board that the reason Gutierrez had signed the affidavit was that he'd threatened a defamation suit, showing that her whole story was a sham, say the two directors."[119] Yet neither the Board nor Maerov conducted an independent

---

[118] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

[119] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

investigation, nor requested to see the standard types of documents that would be produced in such an investigation including correspondence, any settlement agreements, and records of payments.

186.    While Maerov did demand to see Weinstein's personnel file, he backed down after David Boies accused Maerov of leaking sensitive information.[120] While the Board could have sued for access to the file, Maerov said he consulted with the other Board members but decided not to because it "could have been very damaging to the company."[121]

187.    The Board's decision was also motivated by the fact that Harvey Weinstein "agreed to hold TWC and its directors harmless from any claim, liability, loss, or expense resulting from any incident, resolved or unresolved, disclosed in his personnel file," [122] thus putting their personal interests over their duties as Directors.

188.    After the sting, the Board decided to renew Harvey Weinstein's employment contract. Maerov agreed to be responsible for handling the contract negotiations and thus was familiar with—or should have been familiar with—all relevant information to his continued employment.

189.    Attorney David Boies said, in a letter to the Financial Times on October 24, 2017, that the assertion "that Messrs, Maerov and Ben Ammar did not know about Weinstein's settlements with women when they approved his 2015 contract . . . is simply false."

---

[120] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[121] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[122] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

- 57 -

190.     Apparently, Maerov's decision to acquiesce and permit Harvey Weinstein to continue business as usual was the result, in part, of threats Weinstein made to Maerov that he would find embarrassing details from his past and use them against him if he spoke out.[123]

191.     Maerov's decision to give Harvey Weinstein a pass for the years-long abuse was also motivated, in part, by the fact that the purpose of his position on the Board was to protect WPP's investment in TWC; any actions to oust TWC's Co-Chairman or smear his name (even with truth) would have a detrimental impact on WPP's stake.

192.     Lance Maerov was aware of a book published in 2016 by a producer named Barry Avrich entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended to produce a film about Harvey Weinstein's life but that Weinstein shut it down. Avrich wrote that, during one of his meetings with Harvey to try and persuade him to cooperative, Avrich said to Harvey:

> Harvey, I'm not telling the stories that maybe you think I'm telling. **People have told me some salacious stories**, but I'm not going down that road. This is a film about you and your movies, so you have nothing to worry about.[124]

And Avrich hinted at other sexual improprieties in the book.[125]

193.     Yet, despite knowledge of the book and its substance in 2016, Lance Maerov did not conduct an independent investigation or cause TWC or the Board to conduct an investigation of the alleged "salacious conduct" by Harvey Weinstein.

---

[123] https://www.nytimes.com/interactive/2017/12/05/us/harvey-weinstein-complicity.html

[124] Avrich, "Moguls Monsters and Madmen," at 275 (2016) (emphasis supplied).

[125] *Id.* at 279.

5. **Director Tarak Ben Ammar (October 21, 2005–July 13, 2018) knew or should have known that Harvey Weinstein was a serial sexual predator.**

194.     Board Member Tarak Ben Ammar knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class. As a Board member of TWC from October 21, 2005 through July 13, 2018, Ben Ammar was responsible for oversight of the Board's Co-Chairman Harvey Weinstein.

195.     Ben Ammar knew or should have known that Harvey Weinstein was a danger to Plaintiffs and the Class because he:

      a.     witnessed Harvey Weinstein's physically and verbally-abusive behavior;

      b.     was aware that Weinstein was serially targeting women for sex;

      c.     saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

      d.     received direct and indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

      e.     discussed with other TWC Board members, separately and at Board meetings, complaints about Harvey Weinstein's sexual misconduct;

      f.     knew of payments made by TWC to settle claims by women who were sexually assaulted by Weinstein;

      g.     had or should have had access to Harvey's personnel file, which contained complaints about Harvey's misconduct;

      h.     knew that TWC paid Boies Schiller and other enterprise participants, and knew or should have known the purpose of those payments was to cover up Harvey's pattern of assault.

196.    According to Fortune magazine, Ben Ammar "assert[ed] that Weinstein for years bullied and insulted employees, directors, and his brother, squandered outside investors' money, and ran TWC not to earn profits for its outside investors, but as a personal fiefdom that bestowed celebrity and power."[126] Ben Ammar explained that Harvey Weinstein thought he was "untouchable."[127]

197.    As a Board member, Ben Ammar had access to Harvey Weinstein's personnel file, which contained complaints regarding sexual harassment and abuse by Harvey Weinstein.

198.    Ben Ammar had heard about complaints of Weinstein's sexual misconduct directly from victims as well as through Maerov who heard complaints directly.

199.    Ben Ammar was aware of settlements paid by TWC with victims who were assaulted by Weinstein.

200.    Ben Ammar was aware of references on red carpets, television shows, and publications concerning Harvey Weinstein's sexual misconduct. By way of example:

    a.    In 2005, Ben Ammar was aware of a statement made by Courtney Love on the red carpet of the 2005 Comedy Central celebrity roast of Pamela Anderson about Harvey Weinstein. When asked to give advice to young actresses coming to Hollywood, Love said: "I'll get libeled if I say it . . . If Harvey Weinstein invites you to a private party in the Four Seasons, don't go." [128]

    b.    In 2010, Ben Ammar was aware of a book published by Robert Weinstein's former girlfriend, Ivana Lowell, titled: "Why Not Say What Happened," in

---

[126] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[127] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[128] https://www.youtube.com/watch?v=NkJ63e5Ld0w (last accessed Sept. 21, 2018).

which Lowell describes being sexually harassed and chased by Harvey Weinstein in the office, as well as Harvey's M.O. of undressing and demanding a "massage."

      c.      Ben Ammar was aware that, in a 2012 episode of 30 Rock, the character Jenna says to Tracy: "I'm not afraid of anyone in show business. I turned down intercourse with Harvey Weinstein on no less than three occasions. [Pause] Out of five."[129]

      d.      Ben Ammar was aware of a January 2013 episode of 30 Rock where the character Jenna laments: "I know how former lovers can have a hold over you long after they're gone. In some ways, I'm still pinned under a passed-out Harvey Weinstein and it's Thanksgiving."

      e.      In 2013, Ben Ammar was aware that, at the Academy Awards ceremony, Seth MacFarlane, the creator of *Family Guy*, announced the five nominees for best supporting actress and stated: "Congratulations, you five ladies no longer have to pretend to be attracted to Harvey Weinstein."[130]

201.     Ben Ammar was aware of an article published by Defamer (a Gawker-owned website) on April 2, 2015 entitled "Tell Us What You Know About Harvey Weinstein's 'Open Secret.'"[131] The exposé "revealed" Harvey "Weinstein's M.O. to be the following: he holds 'casting sessions' at his office on Friday evenings when he can be alone, and that he greets

---

[129] The excerpt of the *30 Rock* episode can be found at https://www.youtube.com/watch?v=0ceNfXrccbQ (last accessed September 27, 2018).

[130] James Hibberd, *Seth MacFarlane explains his Harvey Weinstein joke in emotional post*, ENTERTAINMENT WEEKLY (Oct. 11, 2017), http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/.

[131] http://defamer.gawker.com/tell-us-what-you-know-about-harvey-weinsteins-open-sec-1695071092

women in his bathrobe." Yet Ben Ammar did not undertake nor cause TWC or the Board to undertake an investigation of Harvey's conduct.

202.    Ben Ammar also knew of Harvey Weinstein's conduct because he had access to a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room. The memo cited numerous incidents of Weinstein harassing or coercing women into sexual activity and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[132]

203.    According to Robert Weinstein, he and the Board—which included Ben Ammar—had "begged" Harvey Weinstein to get help for his abusive behavior, but Harvey Weinstein refused.

204.    Ben Ammar admitted that he and the TWC Board were aware that Weinstein had been accused of groping model Ambra Battilana Gutierrez in 2015.[133] His knowledge of the police sting resulted in his demand, as a Board member in 2015, that Weinstein sign the Company's new Code of Conduct. However, he and the Board did not actually require Harvey Weinstein to affirm the Code of Conduct, and dropped their demand after the Manhattan District Attorney declined to press charges.

205.    Ben Ammar and Maerov told Fortune Magazine that the Board relied on Weinstein's account that "the whole incident 'was a setup by a shakedown artist.' The proof, he

---

[132] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

[133] Elsa Keslassy, *TWC Board Member: We Demanded Harvey Re-Sign Code of Conduct in 2015*, VARIETY (Oct. 11, 2017).

said, was that he wasn't arrested, and that Gutierrez had signed an affidavit swearing that the

alleged groping never occurred. Weinstein told the board that the reason Gutierrez had signed the

affidavit was that he'd threatened a defamation suit, showing that her whole story was a sham,

say the two directors."[134] Yet neither the Board nor Maerov conducted an independent

investigation, nor requested to see the standard types of documents that would be produced in

such an investigation including correspondence, any settlement agreements, and records of

payments.

206.   After the sting, the Board decided to renew Harvey Weinstein's employment

contract. Attorney David Boies said, in a letter to the Financial Times on October 24, 2017, that

the assertion "that Messrs, Maerov and Ben Ammar did not know about Weinstein's settlements

with women when they approved his 2015 contract . . . is simply false."

207.   Ben Ammar was aware of a book published in 2016 by a producer named Barry

Avrich entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended

to produce a film about Harvey Weinstein's life but that Weinstein shut it down. Avrich wrote

that, during one of his meetings with Harvey to try and persuade him to cooperative, Avrich said

to Harvey:

> Harvey, I'm not telling the stories that maybe you think I'm
> telling. **People have told me some salacious stories**, but I'm not
> going down that road. This is a film about you and your movies, so
> you have nothing to worry about.[135]

And Avrich hinted at other sexual improprieties in the book.[136]

---

[134] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[135] Avrich, "Moguls Monsters and Madmen," at 275 (2016) (emphasis supplied).

[136] *Id.* at 279.

208.    Yet, despite knowledge of the book and its substance in 2016, Ben Ammar did not conduct an independent investigation or cause TWC or the Board to conduct an investigation of the alleged "salacious conduct" by Harvey Weinstein.

### 6.    Director Richard Koenigsberg (October 21, 2005–October 14, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator.

209.    Board Member Richard Koenigsberg knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class. As a Board member of TWC from its inception on October 21, 2005 through October 14, 2017, Koenigsberg was responsible for oversight of the Board's Co-Chairman Harvey Weinstein.

210.    Koenigsberg knew or should have known that Harvey Weinstein was a danger to Plaintiffs and the Class because he:

    a.    witnessed Harvey Weinstein's physically and verbally-abusive behavior;

    b.    was aware that Weinstein was serially targeting women for sex;

    c.    saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

    d.    received direct and indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

    e.    discussed with other TWC Board members, separately and at Board meetings, complaints about Harvey Weinstein's sexual misconduct;

    f.    knew of payments made by Robert Weinstein personally and by TWC to settle claims by women who were sexually assaulted by Harvey Weinstein;

g.      as a "W" series shareholder, he had full access to and duty to operate the day-to-day operations of TWC, and thus had a duty to know of Harvey Weinstein's day-to-day- misconduct;

h.      had or should have had access to Harvey's personnel file, which contained complaints about Harvey's misconduct;

i.      knew that TWC paid Boies Schiller and other enterprise participants, and knew or should have known the purpose of those payments was to cover up Harvey's pattern of assault.

211.    Koenigsberg was the only other Director, besides the Weinstein brothers, who owned "W" shares." "W" shareholders had full control over all decisions involved in running the studio under the TWC operating agreement. Koenigsberg thus had a duty to exercise that control on an informed basis.

212.    Koenigsberg was also Harvey and Robert Weinstein's long-term personal accountant. He was thus aware or should have been aware of the settlements with Harvey Weinstein's victims that were paid out of Harvey Weinstein and Robert Weinstein's personal funds, including but not limited to the 1998 settlement with Zelda Perkins and her colleague, in which Robert Weinstein paid £250,000 from his personal funds.

213.    As a Board member, Koenigsberg had access to Harvey Weinstein's personnel file, which contained complaints regarding sexual harassment and abuse by Harvey Weinstein.

214.    According to Robert Weinstein, he and the Board—which included Koenigsberg—had "begged" Harvey Weinstein to get help for his abusive behavior, but Harvey Weinstein refused.

- 65 -

215.     Koenigsberg was aware of references on red carpets, television shows, and publications concerning Harvey Weinstein's sexual misconduct. By way of example, Koenigsberg was aware of:

a.       A statement made by Courtney Love on the red carpet of the 2005 Comedy Central celebrity roast of Pamela Anderson about Harvey Weinstein. When asked to give advice to young actresses coming to Hollywood, Love said: "I'll get libeled if I say it… If Harvey Weinstein invites you to a private party in the Four Seasons, don't go." [137]

b.       A book published in 2010 by Robert Weinstein's former girlfriend, Ivana Lowell, titled: "Why Not Say What Happened," in which Lowell describes being sexually harassed and chased by Harvey Weinstein in the office, as well as Harvey's M.O. of undressing and demanding a "massage."

c.       A 2012 episode of 30 Rock, the character Jenna says to Tracy: "I'm not afraid of anyone in show business. I turned down intercourse with Harvey Weinstein on no less than three occasions. [Pause] Out of five." [138]

d.       A January 2013 episode of 30 Rock where the character Jenna laments: "I know how former lovers can have a hold over you long after they're gone. In some ways, I'm still pinned under a passed-out Harvey Weinstein and it's Thanksgiving."

---

[137] https://www.youtube.com/watch?v=NkJ63e5Ld0w (last accessed Sept. 21, 2018).

[138] The excerpt of the *30 Rock* episode can be found at https://www.youtube.com/watch?v=0ceNfXrccbQ (last accessed September 27, 2018).

- 66 -

e.      A 2013 Academy Awards ceremony where Seth MacFarlane, the creator

of *Family Guy*, announced the five nominees for best supporting actress and stated:

"Congratulations, you five ladies no longer have to pretend to be attracted to Harvey

Weinstein."[139]

216.    Koenigsberg was aware of an article published by Defamer (a Gawker-owned

website) on April 2, 2015 entitled "Tell Us What You Know About Harvey Weinstein's 'Open

Secret.'"[140] The exposé "revealed" Harvey "Weinstein's M.O. to be the following: he holds

'casting sessions' at his office on Friday evenings when he can be alone, and that he greets

women in his bathrobe." Yet Koenigsberg did not undertake nor cause TWC or the Board to

undertake an investigation of Harvey's conduct.

217.    Koenigsberg knew of Harvey Weinstein's conduct because he had access to a

2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in

casting discussions with many actresses shortly after they were invited to "private appointments"

with Weinstein in his hotel room. The memo cited numerous incidents of Weinstein harassing or

coercing women into sexual activity and expressed fear that Weinstein was using her and other

female employees to "facilitate liaisons with 'vulnerable women who hope he will get them

work.'"[141]

---

[139] James Hibberd, *Seth MacFarlane explains his Harvey Weinstein joke in emotional post*, ENTERTAINMENT WEEKLY (Oct. 11, 2017), http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/.

[140] http://defamer.gawker.com/tell-us-what-you-know-about-harvey-weinsteins-open-sec-1695071092

[141] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

218.     Koenigsberg also knew about the sting conducted by the New York police to
obtain a confession from Harvey Weinstein after he assaulted model Ambra Gutierrez. His
knowledge of the police sting resulted in his demand, as a Board member in 2015, that Weinstein
sign the Company's new Code of Conduct. However, he and the Board did not actually require
Harvey Weinstein to affirm the Code of Conduct, and dropped their demand after the Manhattan
District Attorney declined to press charges.

219.     Yet neither the Board nor Koenigsberg conducted an independent investigation,
nor requested to see the standard types of documents that would be produced in such an
investigation including correspondence, any settlement agreements, and records of payments.

220.     While the Board did demand to see Weinstein's personnel file, Harvey's attorney,
David Boies, refused.[142] While the Board could have sued for access to the file, the Board
decided not to because it "could have been very damaging to the company."[143]

221.     Moreover, the Board's decision also motivated by the fact that Harvey Weinstein
"agreed to hold TWC and its directors harmless from any claim, liability, loss, or expense
resulting from any incident, resolved or unresolved, disclosed in his personnel file," [144] thus
putting their personal interests over their duties as Directors.

222.     After the sting, and without requiring full access to all relevant information that
they knew existed, the Board decided to renew Harvey Weinstein's employment contract.

223.     Konigsberg was aware of a book published in 2016 by a producer named Barry
Avrich entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended

---

[142] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[143] *Id.*

[144] *Id.*

to produce a film about Harvey Weinstien's life but that Weinstein shut it down. Avrich wrote

that, during one of his meetings with Harvey to try and persuade him to cooperative, Avrich said

to Harvey:

> Harvey, I'm not telling the stories that maybe you think I'm
> telling. **People have told me some salacious stories**, but I'm not
> going down that road. This is a film about you and your movies, so
> you have nothing to worry about.[145]

And Avrich hinted at other sexual improprieties in the book.[146]

224.    Yet, despite knowledge of the book and its substance in 2016, Koenigsberg did

not conduct an independent investigation or cause TWC or the Board to conduct an investigation

of the alleged "salacious conduct" by Harvey Weinstein.

225.    Koenigsberg failed to take action because he was caught in the spiderweb of the

social benefits and power provided by Harvey Weinstein, and benefitted financially by continued

retention as the Weinstein's personal accountant. He understood that Harvey Weinstein

appointed him as a "W" series shareholder in order to protect Weinstein from termination or

other punitive measures resulting from his predatory sexual misconduct.

**7.    Director Dirk Ziff (October 21, 2005–April 30, 2009; in or about 2011–
       October 6, 2017) knew or should have known that Harvey Weinstein was a
       serial sexual predator.**

226.    Board Member Dirk Ziff knew or should have known that Harvey Weinstein was

regularly sexually assaulting, battering, harassing and threatening women in the Class.

Considered a "Harvey Loyalist" by other Board members, Ziff and Harvey Weinstein were

renowned in show biz circles for partying together.

---

[145] Avrich, "Moguls Monsters and Madmen," at 275 (2016) (emphasis supplied).

[146] *Id.* at 279.

227.     As a Board member of TWC from its inception in 2005 through October 6, 2017

(with an approximate one-year break), Ziff was responsible for oversight of the Board's Co-

Chairman Harvey Weinstein. In 2009, the Wall Street Journal reported that the Weinsteins did

not pay back a $75 million bridge loan from Ziff Brothers Investments and that Dirk Ziff

resigned from the TWC Board earlier that year. TWC refinanced the loan in early 2012.

However, Ziff was a Board member again by 2011 (and could have been earlier).[147]

228.     Ziff knew or should have known that Harvey Weinstein was a danger to Plaintiffs

and the Class because he:

   a. witnessed Harvey Weinstein's physically and verbally-abusive behavior;

   b. was aware that Weinstein was serially targeting women for sex;

   c. saw and read references in books, on television shows, and in televised

interviews of complaints that Harvey was assaulting women;

   d. received direct and indirect verbal and written complaints made by and on

behalf of female victims who were sexually assaulted by Harvey Weinstein;

   e. discussed with other TWC Board members, separately and at Board

meetings, complaints about Harvey Weinstein's sexual misconduct;

   f. knew of payments by TWC to settle claims by women who were sexually

assaulted by Harvey Weinstein;

   g. as one of three shareholders appointed to the "outside director" seats, he

knew Harvey Weinstein had appointed him to ensure that any votes to terminate Harvey

or otherwise punish him for his sexual misconduct would be rejected – and thus he was

not independent;

---

[147] https://www.vanityfair.com/news/2011/03/weinstein-miramax-201103

h.      had or should have had access to Harvey's personnel file, which contained complaints about Harvey's misconduct;

i.      knew that TWC paid Boies Schiller and other enterprise participants, and knew or should have known the purpose of those payments was to cover up Harvey's pattern of assault.

229.    As a Board member, Ziff had access to Harvey Weinstein's personnel file, which contained complaints regarding sexual harassment and abuse by Harvey Weinstein.

230.    Ziff was aware of references on red carpets, television shows, and publications concerning Harvey Weinstein's sexual misconduct. By way of example, Ziff was aware of:

a.      A statement made by Courtney Love on the red carpet of the 2005 Comedy Central celebrity roast of Pamela Anderson about Harvey Weinstein. When asked to give advice to young actresses coming to Hollywood, Love said: "I'll get libeled if I say it . . . If Harvey Weinstein invites you to a private party in the Four Seasons, don't go."[148]

b.      A book published in 2010 by Robert Weinstein's former girlfriend, Ivana Lowell, titled: "Why Not Say What Happened," in which Lowell describes being sexually harassed and chased by Harvey Weinstein in the office, as well as Harvey's M.O. of undressing and demanding a "massage."

---

[148] https://www.youtube.com/watch?v=NkJ63e5Ld0w (last accessed Sept. 21, 2018).

c.      A 2012 episode of 30 Rock, the character Jenna says to Tracy: "I'm not afraid of anyone in show business. I turned down intercourse with Harvey Weinstein on no less than three occasions. [Pause] Out of five."[149]

d.      A January 2013 episode of 30 Rock where the character Jenna laments: "I know how former lovers can have a hold over you long after they're gone. In some ways, I'm still pinned under a passed-out Harvey Weinstein and it's Thanksgiving."

e.      A 2013 Academy Awards ceremony where Seth MacFarlane, the creator of *Family Guy*, announced the five nominees for best supporting actress and stated: "Congratulations, you five ladies no longer have to pretend to be attracted to Harvey Weinstein."[150]

231.    Ziff was aware of an article published by Defamer (a Gawker-owned website) on April 2, 2015 entitled "Tell Us What You Know About Harvey Weinstein's 'Open Secret.'"[151] The exposé "revealed" Harvey "Weinstein's M.O. to be the following: he holds 'casting sessions' at his office on Friday evenings when he can be alone, and that he greets women in his bathrobe." Yet Robert Weinstein did not undertake nor cause TWC or the Board to undertake an investigation of Harvey's conduct.

---

[149] The excerpt of the *30 Rock* episode can be found at https://www.youtube.com/watch?v=0ceNfXrccbQ (last accessed September 27, 2018).

[150] James Hibberd, *Seth MacFarlane explains his Harvey Weinstein joke in emotional post*, ENTERTAINMENT WEEKLY (Oct. 11, 2017), http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/.

[151] http://defamer.gawker.com/tell-us-what-you-know-about-harvey-weinsteins-open-sec-1695071092

232.     Ziff also knew of Harvey Weinstein's conduct because he had access to a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room. The memo cited numerous incidents of Weinstein harassing or coercing women into sexual activity and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[152]

233.     According to Robert Weinstein, he and the Board—which included Ziff—had "begged" Harvey Weinstein to get help for his abusive behavior, but Harvey Weinstein refused.

234.     Ben Ammar admitted that he and the TWC Board (including Ziff) were aware that Weinstein had been accused of groping model Ambra Battilana Gutierrez in 2015.[153] That knowledge of the police sting resulted in the Board's 2015 demand that Weinstein sign the Company's new Code of Conduct. However, he and the Board did not actually require Harvey Weinstein to affirm the Code of Conduct, and dropped their demand after the Manhattan District Attorney declined to press charges.

235.     The Board relied on Weinstein's account that "the whole incident 'was a setup by a shakedown artist.' The proof, he said, was that he wasn't arrested, and that Gutierrez had signed an affidavit swearing that the alleged groping never occurred. Weinstein told the board that the reason Gutierrez had signed the affidavit was that he'd threatened a defamation suit,

---

[152] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

[153] Elsa Keslassy, *TWC Board Member: We Demanded Harvey Re-Sign Code of Conduct in 2015*, VARIETY (Oct. 11, 2017).

showing that her whole story was a sham, say the two directors."[154] Yet neither the Board nor

Ziff conducted an independent investigation, nor requested to see the standard types of

documents that would be produced in such an investigation including correspondence, any

settlement agreements, and records of payments.

236.    While the Board did demand to see Weinstein's personnel file, Harvey's attorney,

David Boies, refused.[155] The Board could have sued for access to the file, but decided not to

because it "could have been very damaging to the company."[156]

237.    Moreover, the Board's decision also motivated by the fact that Harvey Weinstein

"agreed to hold TWC and its directors harmless from any claim, liability, loss, or expense

resulting from any incident, resolved or unresolved, disclosed in his personnel file," [157] thus

putting their personal interests over their duties as Directors.

238.    After the sting, and without requiring full access to all relevant information that

they knew existed, the Board decided to renew Harvey Weinstein's employment contract.

239.    Ziff was aware of a book published in 2016 by a producer named Barry Avrich

entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended to

produce a film about Harvey Weinstein's life but that Weinstein shut it down. Avrich wrote that,

during one of his meetings with Harvey to try and persuade him to cooperative, Avrich said to

Harvey:

---

[154] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[155] *Id.*

[156] *Id.*

[157] *Id.*

Harvey, I'm not telling the stories that maybe you think I'm telling. ***People have told me some salacious stories***, but I'm not going down that road. This is a film about you and your movies, so you have nothing to worry about.[158]

And Avrich hinted at other sexual improprieties in the book.[159]

240.     Yet, despite knowledge of the book and its substance in 2016, Ziff did not conduct an independent investigation or cause TWC or the Board to conduct an investigation of the alleged "salacious conduct" by Harvey Weinstein.

241.     Ziff failed to take action because he was caught in the spiderweb of the social benefits and power provided by Harvey Weinstein. He understood that Harvey Weinstein appointed him as an "outside director" in order to protect Weinstein from termination or other punitive measures resulting from his predatory sexual misconduct. Ziff also failed to take action because he put protection of his equity investment in TWC over his duties as a director.

**8.     Director Tim Sarnoff (June 25, 2013–October 6, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator.**

242.     Tim Sarnoff knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class.

243.     Sarnoff joined the company Technicolor in 2009 as President of Digital Productions, and became Deputy CEO and President of Production Services, in 2014.

---

[158] Avrich, "Moguls Monsters and Madmen," at 275 (2016) (emphasis supplied).

[159] *Id.* at 279.

244.     Technicolor was heavily involved with Miramax and TWC, providing post-production effects and processing to films and media.[160] After Sarnoff came aboard at Technicolor, TWC became exclusively reliant on Technicolor's post-production services.

245.     In a TWC bankruptcy filing, Technicolor explained that TWC (and all of its affiliates), through a series of agreements,[161] "have agreed to exclusively use Technicolor for their post-production film and television services, certain distribution services, and home delivery solutions requirements, which services are integral to the transition of the Debtors' film and television projects into "finished products" for distribution and delivery. Following release of the Debtors' film and television productions, Technicolor serves as the exclusive party responsible for the replication, duplication, packaging, and distribution of the Debtors' film and television products into the hands of consumers (via mediums such as DVD, Blu-Ray, broadcast, and streaming services)."

---

[160] *See, e.g.,* https://www.technicolor.com/fr/news/technicolors-new-mediaffinity-service-provides-weinstein-company-fully-automated-digital (explaining Technicolor had worked with TWC for years and was providing a new service to TWC to digitally automate its library); Down and Dirty Pictures, at 200.

[161] Limited Objection And Reservation Of Rights To Debtors' Motion For An Order (I) Approving Postpetition Financing, (II) Authorizing Use Of Cash Collateral, (III) Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, And (VI) Granting Related Relief, *In re: THE WEINSTEIN COMPANY HOLDINGS, LLC, et al.*, No. 18-10601 (MFW) (Bk. D. Del.) (Dkt. No. 208) (explaining that Technicolor and TWC entered The Restated Replication, Duplication, Packaging, Distribution and Returns Processing Agreement, dated as of September 2, 2005, as amended ("HES Agreement"); The Restated Film Laboratory Services Agreement dated as of July 2, 2010, as amended ("Film Agreement"); The Restated TCD Services Agreement dated as of July 2, 2010, as amended ("TCD Agreement"); The Technical Services Agreement dated as of July 2, 2010, as amended ("TS Agreement"); The Agreement and Amendment to Technicolor Agreements dated as of July 19, 2011 ("July 2011 Agreement"), and explaining that Technicolor and TWCH are parties to the Guarantee for the benefit of Technicolor HES, Inc., Technicolor CD, and Technicolor Michigan dated as of July 17, 2006, as amended (the "Technicolor Agreements Guarantee"); and That Guarantee for the benefit of Technicolor, Inc. dated as of July 2, 2010.

246.     However, in or about 2012, TWC fell behind on its payments to Technicolor. After the parties worked out a repayment plan and agreed to certain liens on TWC assets, TWC agreed to add Sarnoff to TWC's Board as a Director in 2013. Sarnoff's purpose was to protect Technicolor's security interests, while also protecting Sarnoff's friend Harvey Weinstein.

247.     Sarnoff knew or should have known that Harvey Weinstein was a danger to Plaintiffs and the Class because he:

      a.     witnessed Harvey Weinstein's physically and verbally-abusive behavior;

      b.     was aware that Weinstein was serially targeting women for sex;

      c.     saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

      d.     received direct and/or indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

      e.     discussed with other TWC Board members, separately and at Board meetings, complaints about Harvey Weinstein's sexual misconduct;

      f.     knew of payments by TWC to settle claims by women who were sexually assaulted by Harvey Weinstein;

      g.     as one of the shareholders appointed to the "outside director" seats, he knew Harvey Weinstein had appointed him to ensure that any votes to terminate Harvey or otherwise punish him for his sexual misconduct would be rejected – and thus he was not independent;

      h.     had or should have had access to Harvey's personnel file, which contained complaints about Harvey's misconduct;

i.      knew that TWC paid Boies Schiller and other enterprise participants, and

knew or should have known the purpose of those payments was to cover up Harvey's

pattern of assault.

248.    As a Board member, Sarnoff had access to Harvey Weinstein's personnel file,

which contained complaints regarding sexual harassment and abuse by Harvey Weinstein.

249.    Sarnoff was aware of references on red carpets, television shows, and publications

concerning Harvey Weinstein's sexual misconduct. By way of example, Sarnoff was aware of a

2013 Academy Awards ceremony where Seth MacFarlane, the creator of *Family Guy*,

announced the five nominees for best supporting actress and stated: "Congratulations, you five

ladies no longer have to pretend to be attracted to Harvey Weinstein."[162]

250.    Sarnoff was also aware of an article published by Defamer (a Gawker-owned

website) on April 2, 2015 entitled "Tell Us What You Know About Harvey Weinstein's 'Open

Secret.'"[163] The exposé "revealed" Harvey "Weinstein's M.O. to be the following: he holds

'casting sessions' at his office on Friday evenings when he can be alone, and that he greets

women in his bathrobe." Yet Sarnoff did not undertake nor cause TWC or the Board to

undertake an investigation of Harvey's conduct.

251.    Sarnoff had access to a 2015 memorandum authored by then-TWC employee

Lauren O'Connor, who was involved in casting discussions with many actresses shortly after

they were invited to "private appointments" with Weinstein in his hotel room. The memo cited

---

[162] James Hibberd, *Seth MacFarlane explains his Harvey Weinstein joke in emotional post*, ENTERTAINMENT WEEKLY (Oct. 11, 2017), http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/.

[163] http://defamer.gawker.com/tell-us-what-you-know-about-harvey-weinsteins-open-sec-1695071092

numerous incidents of Weinstein harassing or coercing women into sexual activity and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[164]

252.    Sarnoff also knew about the sting conducted by the New York police to obtain a confession from Harvey Weinstein after he assaulted model Ambra Gutierrez. His knowledge of the police sting resulted in his demand, as a Board member in 2015, that Weinstein sign the Company's new Code of Conduct. However, he and the Board did not actually require Harvey Weinstein to affirm the Code of Conduct, and dropped their demand after the Manhattan District Attorney declined to press charges.

253.    The Board, including Sarnoff, relied on Weinstein's account that "the whole incident 'was a setup by a shakedown artist.' The proof, he said, was that he wasn't arrested, and that Gutierrez had signed an affidavit swearing that the alleged groping never occurred. Weinstein told the board that the reason Gutierrez had signed the affidavit was that he'd threatened a defamation suit, showing that her whole story was a sham, say the two directors."[165] Yet neither the Board nor Sarnoff conducted an independent investigation, nor requested to see the standard types of documents that would be produced in such an investigation including correspondence, any settlement agreements, and records of payments.

254.    While the Board could have sued for access to the file, Sarnoff and the Board decided not to because he knew it "could have been very damaging to the company."[166]

---

[164] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

[165] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

[166] *Id.*

Moreover, the Board's decision was motivated by the fact that Harvey Weinstein "agreed to hold TWC and its directors harmless from any claim, liability, loss, or expense resulting from any incident, resolved or unresolved, disclosed in his personnel file," [167] thus putting their personal interests over their duties as Directors.

255.    After the sting, the Board decided to renew Harvey Weinstein's employment contract.

256.    Sarnoff was aware of a book published in 2016 by a producer named Barry Avrich entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended to produce a film about Harvey Weinstein's life but that Weinstein shut it down. Avrich wrote that, during one of his meetings with Harvey to try and persuade him to cooperative, Avrich said to Harvey:

> Harvey, I'm not telling the stories that maybe you think I'm telling. ***People have told me some salacious stories***, but I'm not going down that road. This is a film about you and your movies, so you have nothing to worry about.[168]

And Avrich hinted at other sexual improprieties in the book.[169]

257.    Yet, despite knowledge of the book and its substance in 2016, Sarnoff did not conduct an independent investigation or cause TWC or the Board to conduct an investigation of the alleged "salacious conduct" by Harvey Weinstein.

258.    Robert Weinstein also admitted that he and the Board (including Sarnoff) "begged" Harvey Weinstein to get help for years. In response to witnessing his brother engaging

---

[167] *Id.*

[168] Avrich, "Moguls Monsters and Madmen," at 275 (2016) (emphasis supplied).

[169] *Id.* at 279.

in verbal and physical abuse, Robert Weinstein explained: "I asked him to get help for many years. And that's the truth. He avoided getting the help. We begged him." [170]

259.    Sarnoff failed to take action because he was caught in the spider web of the social benefits and power provided by Harvey Weinstein. He understood that Harvey Weinstein appointed him as an "outside director" in order to protect Weinstein from termination or other punitive measures resulting from his predatory sexual misconduct.  Sarnoff also failed to take action because he put protection of Technicolor's exclusivity agreements with TWC over his duties as a director.

**9.    Director James Dolan (September 30, 2015–June 20, 2016) knew or should have known that Harvey Weinstein was a serial sexual predator.**

260.    Board Member James Dolan knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class.

261.    By 2010, producer Barry Avrich had completed filming a movie about Harvey Weinstein, based on dozens of interviews including people who shared "salacious" stories about Harvey's conduct. Harvey had cajoled, berated and threatened Avrich in an attempt to prevent the making of the movie, but Avrich could not be stopped in his desire to produce a film about Harvey Weinstein.

262.    By September 2010, word had traveled in the industry that Avrich had a rough cut of the film about Harvey Weinstein ready for viewing. IFC Films, an influential New York-based distribution company asked for a screening. IFC Films is a subsidiary of AMC Networks, an entertainment company majority-owned and run by the Dolan family, including James Dolan.

---

[170] https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905

263.    IFC Films expressed enthusiasm about the Harvey Weinstein film, and rushed a

deal to buy the film from Avrich claiming it would release it through its own television and

theater network. As Avrich recalled, "Neither I nor my lawyers stopped to ask, *Why the rush?*

Hell, they even had me sign the contract on the hood of a stranger's Ferrari in front of

Yorkville's Sassafraz restaurant." [171]

264.    Avrich then began the final editing on the film. However, when he had a final cut,

IFC Films told Avrich that Harvey Weinstein objected and required changes to certain scenes,

including cutting the scene where Avrich had portrayed Weinstein instructing an actor reshooting

a sex scene: "You're going to hump her and hump her and hump her and hump her, and then

you're going to flip her over and do her the other way."[172] Avrich was surprised that Harvey

Weinstein would have any input or oversight at all on the film—until he realized IFC purchased

the film at Weinstein's request in order to allow Harvey Weinstein to bury any hint at sexual

abuse.

265.    Then, when the film *Unauthorized* debuted at the Toronto International Film

Festival, IFC demanded Avrich make a list of changes required by Harvey Weinstein.

Ultimately, the movie was significantly altered and buried—because James Dolan and his family

was protecting Harvey Weinstein. Thus, James Dolan was well aware of Harvey Weinstein's

reputation and his desire to hide and cover up any hint at his sexual misconduct.

266.    Just before Harvey Weinstein's 2015 contract was renewed, several directors

attempted to engineer a proxy fight. In order to engineer a majority of the Board who were his

---

[171] Avrich, "Moguls Monsters and Madmen," at 287 (2016) (italics in original).

[172] *Id.* at 279.

personal friends, Harvey Weinstein appointed James Dolan to the board, knowing Dolan would continue to protect him regardless of his conduct.

267.    According to Harvey, Dolan was one of his and his brother's "best friends." And the other members of the Board considered Dolan to be a "Harvey Loyalist."

268.    As a Board member, Dolan knew or should have known that Harvey Weinstein was a danger to Plaintiffs and the Class because he:

        a.    witnessed Harvey Weinstein's physically and verbally-abusive behavior;

        b.    was aware that Weinstein was serially targeting women for sex;

        c.    saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

        d.    received direct and/or indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

        e.    discussed with other TWC Board members, separately and at Board meetings, complaints about Harvey Weinstein's sexual misconduct;

        f.    knew of payments by TWC to settle claims by women who were sexually assaulted by Harvey Weinstein;

        g.    as one of the shareholders appointed to the "outside director" seats, he knew Harvey Weinstein had appointed him to ensure that any votes to terminate Harvey or otherwise punish him for his sexual misconduct would be rejected—and thus he was not independent;

        h.    had or should have had access to Harvey's personnel file, which contained complaints about Harvey's misconduct;

i.      knew that TWC paid Boies Schiller and other enterprise participants, and knew or should have known the purpose of those payments was to cover up Harvey's pattern of assault.

269.    Despite his knowledge, Dolan voted to retain and/or approved the retention of Harvey Weinstein soon after joining the Board.

270.    At the time he voted to retain him, Dolan was aware (or should have been aware given the extensive media reports) that Weinstein had been accused of groping model Ambra Battilana Gutierrez in 2015.[173] His knowledge of the police sting resulted in his demand, as a Board member in 2015, that Weinstein sign the Company's new Code of Conduct. However, he and the Board did not actually require Harvey Weinstein to affirm the Code of Conduct, and dropped their demand after the Manhattan District Attorney declined to press charges.

271.    Neither the Board nor Dolan conducted an independent investigation, nor requested to see the standard types of documents that would be produced in such an investigation including correspondence, any settlement agreements, and records of payments.

272.    When he joined the Board, Dolan also should have been aware of a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room, which cited numerous incidents of Weinstein harassing or coercing women and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[174]

---

[173] Elsa Keslassy, *TWC Board Member: We Demanded Harvey Re-Sign Code of Conduct in 2015*, VARIETY (Oct. 11, 2017).

[174] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

273.    Dolan was aware of the book published in 2016 by a producer named Barry Avrich entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended to produce a film about Harvey Weinstein's life but that Weinstein shut it down when Dolan's family-run company IFC Films purchased it.[175]

274.    Yet, despite knowledge of the book and its substance in 2016, as well as his knowledge about Harvey Weinstein's sexual misconduct generally, Dolan did not conduct an independent investigation or cause TWC or the Board to conduct an investigation of the alleged "salacious conduct" by Harvey Weinstein.

275.    In fact, James Dolan has admitted in a song he wrote that he "should've known" about Harvey Weinstein's "vile attacks" on women. Dolan stated in a television interview that Harvey Weinstein was on his mind when he wrote the song (and which he and his band JD & The Straight Shot have performed) titled "I should've known."[176] Dolan wrote the song lyrics:

> We were friends
> We were friends
> Talked for hours without end
> About his latest story
> How to deal with fame and glory
> All the girls who adored him
> Catered to his every whim
> Nothing he could lose
> All he need to do was choose
>
> I should've known
> I should've known
> I should've thrown myself across his tracks
> Stopped him from these vile attacks
> I should've known
> We believed and didn't see
> Through the lies he told us all

---

[175] Avrich, "Moguls Monsters and Madmen," at 275 (2016) (emphasis supplied). *See also id.* at 279.

[176] https://www.si.com/nba/2018/08/09/james-dolan-i-shouldve-known-harvey-weinstein-song-audio

They led him to his endless fall
I should've known
I should've known

I should've known
I should've known

And what of the others
In some way all my brothers
Sitting on the very top
Could not hear the call to stop
Behind locked doors the eyes of men
Who take what don't belong to them
From those who seek the bright and starry
Are threatened with: you will be sorry

I should've known
I should've known
I should've thrown myself across his tracks
Stopped him from these vile attacks
I should've known
We believed and didn't see
Through the lies he told us all
They led him to his endless fall
I should've known
I should've known

I should've known
I should've known
I should've thrown myself across his tracks
Stopped him from these vile attacks
I should've known
We believed and didn't see
Through the lies he told us all
They led him to his endless fall
I should've known
I should've known

I should've known
I should've known

I should've known
I should've known

I should've known
I should've known

010717-11/1104435 V2

Audio of the song being performed by Dolan can be found at:

https://www.si.com/nba/2018/08/09/james-dolan-i-shouldve-known-harvey-weinstein-song-audio (last accessed September 23, 2018).

276.     Dolan failed to take action because he was caught in the spider web of the social benefits and power provided by Harvey Weinstein. He understood that Harvey Weinstein appointed him as an "outside director" in order to protect Weinstein from termination or other punitive measures resulting from his predatory sexual misconduct.

> **10.     Director Paul Tudor Jones (October 20, 2015-October 7, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator.**

277.     Board Member Paul Tudor Jones knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class.

278.     Paul Tudor Jones was appointed to the TWC Board on or about October 20, 2015, the same day that Harvey Weinstein's 2015 Contract was signed.

279.     However, Jones was a friend of Weinstein for some time before the appointment. In fact, Weinstein served as a Director of the Robin Hood Foundation, which Jones had founded. They regularly attended the same galas, charitable events and other parties.

280.     At the time he was appointed to the TWC Board, Jones was aware that several Directors had attempted to engineer a proxy fight to oust Harvey Weinstein for his sexual misconduct and financial improprieties. Jones understood that he was being appointed to the TWC Board as a "Harvey Loyalist" to protect him regardless of his conduct and to ensure that the 2015 Contract was approved.

281.     As a Board member, Jones knew or should have known that Harvey Weinstein was a danger to Plaintiffs and the Class because he:

a.     witnessed Harvey Weinstein's physically and verbally-abusive behavior;

b.     was aware that Weinstein was serially targeting women for sex;

c.     saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

d.     received direct and/or indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

e.     discussed with other TWC Board members, separately and at Board meetings, complaints about Harvey Weinstein's sexual misconduct;

f.     knew of payments by TWC to settle claims by women who were sexually assaulted by Harvey Weinstein;

g.     as one of the shareholders appointed to the "outside director" seats, he knew Harvey Weinstein had appointed him to ensure that any votes to terminate Harvey or otherwise punish him for his sexual misconduct would be rejected – and thus he was not independent;

h.     had or should have had access to Harvey's personnel file, which contained complaints about Harvey's misconduct;

i.     knew that TWC paid Boies Schiller and other enterprise participants, and knew or should have known the purpose of those payments was to cover up Harvey's pattern of assault.

282.     At the time he was appointed to the TWC Board, Jones knew (or should have been aware given the extensive media reports) that Weinstein had been accused of groping

- 88 -

model Ambra Battilana Gutierrez in 2015.[177] Yet Jones did not demand that the Board conduct an independent investigation, nor requested to see the standard types of documents that would be produced in such an investigation including correspondence, any settlement agreements, and records of payments.

283.    When he joined the Board, Jones also should have been aware of a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room, which cited numerous incidents of Weinstein harassing or coercing women and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[178]

284.    Jones was aware of a book published in 2016 by a producer named Barry Avrich entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended to produce a film about Harvey Weinstein's life but that Weinstein shut it down. Avrich wrote that, during one of his meetings with Harvey to try and persuade him to cooperative, Avrich said to Harvey:

> Harvey, I'm not telling the stories that maybe you think I'm telling. **People have told me some salacious stories**, but I'm not going down that road. This is a film about you and your movies, so you have nothing to worry about.[179]

And Avrich hinted at other sexual improprieties in the book.[180]

---

[177] Elsa Keslassy, *TWC Board Member: We Demanded Harvey Re-Sign Code of Conduct in 2015*, VARIETY (Oct. 11, 2017).

[178] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

[179] Avrich, "Moguls Monsters and Madmen," at 275 (2016) (emphasis supplied).

[180] *Id.* at 279.

285.     Yet, despite knowledge of the book and its substance in 2016, Jones did not conduct an independent investigation or cause TWC or the Board to conduct an investigation of the alleged "salacious conduct" by Harvey Weinstein.

286.     Even after the October 5, 2017 story published by The New York Times entitled "Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades," Jones stayed loyal to Harvey—putting friendship and loyalty over duty.

287.     That evening, Jones attended a board meeting via conference call, during which the Board considered terminating Harvey. Despite Harvey's violations of the company's Code of Conduct (not to mention the illegality of sexual assault), Jones expressed doubts on the Board's ability to legally remove Harvey.[181]

288.     On October 6, 2017, four Board members issued a release stating that Harvey Weinstein was taking "an indefinite leave of absence," adding that "It's important for him to get the professional help for the problems he has acknowledged." The board also announced an independent investigation.

289.     Jones did not sign the October 6, 2017 release. Rather than independently condemn the assault allegations, Jones sent an email on October 6, 2017 to Maerov, stating: "At this time I would prefer NOT to sign it as the last paragraph about Bob taking control implies levels of legality and board authority that I don't fully comprehend or understand. Respectfully, Paul"

290.     On October 7, 2017, Jones sent Harvey an email, telling him: "I love you." Jones encouraged him to '"Focus on the future as America loves a great comeback story," and stated: "The good news is, this will go away sooner than you think and it will be forgotten!"

---

[181] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

291.     Jones resigned from the Board on October 7, 2017.

292.     After considerable backlash within his own company, Tudor Investments, Jones sent a memo on December 6, 2017 to employees attempting to explain why he supported Harvey Weinstein for so long. He admitted that: ". . . what I know now is that Harvey was a friend I believed too long and defended too long."[182]

293.     Jones failed to take action because he was caught in the spider web of the social benefits and power provided by Harvey Weinstein. He understood that Harvey Weinstein appointed him as an "outside director" in order to protect Weinstein from termination or other punitive measures resulting from his predatory sexual misconduct.

**11.     Director Marc Lasry (June 20, 2016–October 7, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator.**

294.     Board Member Marc Lasry knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class.

295.     Lasry was a neighbor of Harvey Weinstein's in Westport, Connecticut. They and their families regularly socialized together, and Lasry and Weinstein attended the same galas, charitable events and other parties.

296.     Several women were assaulted during the course of family parties at Harvey Weinstein's home; accordingly, the fact that Lasry's family may have been present is not an immunizing factor.

297.     As a Board member, Lasry knew or should have known that Harvey Weinstein was a danger to Plaintiffs and the Class because he:

      a.     witnessed Harvey Weinstein's physically and verbally-abusive behavior;

---

[182] https://www.cnbc.com/2017/12/06/paul-tudor-jones-distances-himself-from-harvey-weinstein.html

b.      was aware that Weinstein was serially targeting women for sex;

c.      saw and read references in books, on television shows, and in televised interviews of complaints that Harvey was assaulting women;

d.      received direct and/or indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein;

e.      discussed with other TWC Board members, separately and at Board meetings, complaints about Harvey Weinstein's sexual misconduct;

f.      knew of payments by TWC to settle claims by women who were sexually assaulted by Harvey Weinstein;

g.      as one of the shareholders appointed to the "outside director" seats, he knew Harvey Weinstein had appointed him to ensure that any votes to terminate Harvey or otherwise punish him for his sexual misconduct would be rejected – and thus he was not independent;

h.      had or should have had access to Harvey's personnel file, which contained complaints about Harvey's misconduct;

i.      knew that TWC paid Boies Schiller and other enterprise participants, and knew or should have known the purpose of those payments was to cover up Harvey's pattern of assault.

298.    At the time he was appointed to the TWC Board, Lasry knew (or should have been aware given the extensive media reports) that Weinstein had been accused of groping model Ambra Battilana Gutierrez in 2015.[183] Yet Lasry did not demand that the Board conduct

---

[183] Elsa Keslassy, *TWC Board Member: We Demanded Harvey Re-Sign Code of Conduct in 2015*, VARIETY (Oct. 11, 2017).

an independent investigation, nor requested to see the standard types of documents that would be produced in such an investigation including correspondence, any settlement agreements, and records of payments.

299.    Lasry was aware of a book published in 2016 by a producer named Barry Avrich entitled "Moguls Monsters and Madmen," in which Avrich disclosed that he had intended to produce a film about Harvey Weinstein's life but that Weinstein shut it down (and removed any disclosure of sexual improprieties along the way).[184]

300.    Yet, despite knowledge of the book and its substance in 2016, Lasry did not conduct an independent investigation or cause TWC or the Board to conduct an investigation of the alleged "salacious conduct" by Harvey Weinstein.

301.    Lasry failed to take action because he was caught in the spiderweb of the social benefits and power provided by Harvey Weinstein. He understood that Harvey Weinstein appointed him as an "outside director" in order to protect Weinstein from termination or other punitive measures resulting from his predatory sexual misconduct.

**12.    TWC's President and Chief Operating Officer David Glasser (2008– February 16, 2018) knew or should have known that Harvey Weinstein was a serial sexual predator.**

302.    TWC's President and Chief Operating Officer from 2011 (and employee since 2008) until his termination in February 2018, David Glasser knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class. Glasser's knowledge was based, in part, on his close working and personal

---

[184] *Id.* at 279.

relationship with Weinstein; he was known as Harvey Weinstein's and Robert Weinstein's "third brother," and served as Harvey Weinstein's right-hand man.[185]

303.    As President and COO, Glasser was responsible for oversight of the human resources department at TWC. He thus knew or should have known of the numerous complaints of sexual misconduct and assault against Harvey Weinstein and their mishandling, including the fact that the department forwarded the complaints to Weinstein resulting in retaliation against the accusers.[186]

304.    According to the New York Attorney General, Glasser received and knew of dozens of formal and informal complaints regarding Harvey Weinstein, including regarding sexual harassment and abuse by Harvey Weinstein.

305.    Glasser was aware of information in Harvey Weinstein's personnel file that reflected complaints regarding sexual harassment and abuse by Harvey Weinstein.

306.    Glasser knew that Harvey Weinstein used funds from The Weinstein Company to pay for hotel rooms where women were lured by TWC employees under the pretense of official meetings, but were assaulted after the TWC employees were told to leave. Glasser knew that Harvey Weinstein used TWC employees to lure victims to Weinstein's office or hotel room or home to be assaulted.

307.    Glasser was aware of the sting conducted by the New York police to obtain a confession from Harvey Weinstein after he assaulted model Ambra Gutierrez, and the follow-up settlement with Gutierrez.

---

[185] http://www.latimes.com/business/hollywood/la-fi-ct-david-glasser-weinstein-20180218-story.html#

[186] https://variety.com/2018/biz/news/david-glasser-weinstein-co-eric-schneiderman-1202695367/

010717-11/1104435 V2

308.     Glasser also knew of Harvey Weinstein's conduct because he received a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room. The memo cited numerous incidents of Weinstein harassing or coercing women into sexual activity and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'"[187]

309.     Glasser admitted that he was aware of a 2009 incident between Harvey Weinstein and "a woman in publicity," the incident involving Emily Nestor, the Ambra Gutierrez incident leaked in 2015, and the 2015 memo from Lauren O'Connor.[188] He also "always thought and heard" Harvey Weinstein was unfaithful. [189] Yet he did not cause any of the incidents to be independently investigated.

310.     Instead, Glasser engaged in steps to cover up the behavior, including but not limited to sharing complaints directly with Harvey Weinstein, failing to document complaints, hiding complaints, and facilitating payments to victims.

---

[187] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

[188] https://deadline.com/2017/10/david-glasser-harvey-weinstein-bob-weinstein-the-weinstein-company-1202188171/

[189] https://deadline.com/2017/10/david-glasser-harvey-weinstein-bob-weinstein-the-weinstein-company-1202188171/

**13.     TWC's Vice President of Human Resources Frank Gil (2007–October 9, 2017) knew or should have known that Harvey Weinstein was a serial sexual predator.**

311.    TWC's Senior Vice President of Human Resources from 2007 to October 9, 2017, Frank Gil knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class.

312.    Gil was responsible for the human resources department at TWC, where numerous complaints of sexual misconduct and assault against Harvey Weinstein were not properly handled.

313.    Gil implemented or ratified the practice of the human resources department of forwarding complaints about Weinstein's sexual misconduct to Weinstein, resulting in retaliation against the accusers.[190]

314.    Gil also authorized a bonus for former employee Sandeep Rehal for Rehal's procurement of erectile dysfunction drugs for Weinstein (which he used before assaulting various victims).

315.    According to one of Harvey Weinstein's TWC assistants from February 2013 to February 2015, Sandeep Rehal: "Harvey Weinstein's sexual abuse and conduct, and his use of the office, TWC and staff to enable it, was common knowledge in the office, to management, to his brother Robert Weinstein, and to Frank Gil."[191]

---

[190] https://variety.com/2018/biz/news/david-glasser-weinstein-co-eric-schneiderman-1202695367/

[191] Complaint, ¶ 30, *Sandeep Rehal v. Harvey Weinstein et al.*, No. 18 CV 674 (S.D.N.Y.) (Dkt. No. 1).

316.     During this period from 2013 to 2015, among other things, Rehal was required to clean Harvey Weinstein's semen off the couch in his TWC office "three or so times a week when Harvey Weinstein was in New York." [192] Rehal alleges that Frank Gil was aware of Weinstein's sexual acts in his TWC office.

317.     Gil received a 2015 memorandum authored by then-TWC employee Lauren O'Connor, who was involved in casting discussions with many actresses shortly after they were invited to "private appointments" with Weinstein in his hotel room. The memo cited numerous incidents of Weinstein harassing or coercing women into sexual activity and expressed fear that Weinstein was using her and other female employees to "facilitate liaisons with 'vulnerable women who hope he will get them work.'" [193]

318.     Gil also knew about the sting conducted by the New York police to obtain a confession from Harvey Weinstein after he assaulted model Ambra Gutierrez.

319.     Moreover, Gil's knowledge is demonstrated by his actions to cover up evidence of Harvey Weinstein's assaults just before The New York Times published its exposé in 2017. On or about October 1, 2017, according to TWC, Gil entered the offices of TWC employees without their knowledge in order to take or destroy personnel files containing evidence of Harvey Weinstein's sexual abuse of women.

---

[192] Complaint, ¶ 30, *Sandeep Rehal v. Harvey Weinstein et al.*, No. 18 CV 674 (S.D.N.Y.) (Dkt. No. 1).

[193] https://www.vox.com/culture/2017/10/6/16432526/harvey-weinstein-allegations-whos-involved

320.     In fact, Gil sought compensation from Harvey Weinstein (in the form of company funds) in exchange for providing confidential information from human resources files regarding complaints about Harvey to him.[194]

**14.     TWC Officer Barbara Schneeweiss (2005-2017) knew or should have known of Harvey Weinstein's predatory sexual misconduct.**

321.     TWC Officer Barbara Schneeweiss knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women in the Class.

322.     Schneeweiss was regularly tasked at TWC with scheduling appointments with Weinstein's victims at hotels. She would meet the victims in the hotel restaurant or lobby where the victims understood the meeting would take place. Schneeweiss would then advise the women that Weinstein was running late or stuck on a telephone call, so the meeting had been moved to his hotel suite.

323.     Sometimes Schneeweiss would lead to the women up to Weinstein's hotel suite to give the meeting an air of legitimacy; sometimes, she would direct the victims to go up to his hotel suite, reassuring them that the meeting was for a legitimate purpose.

324.     Schneeweiss would then leave the meeting, or ensure that the victim was left alone with Weinstein while the assault occurred.

325.     Schneeweiss was also used by Weinstein in an attempt to placate his victims after the assaults occurred. For example, Weinstein used Schneeweiss to correspond and meet with Melissa Thompson and several other victims (after the assaults occurred) under the guise they were going to be part of a new show called Women Inc. Weinstein also used Schneeweiss to

---

[194] Adam Ciralsky, NIGHT MARE on Greenwich Street, Vanity Fair (Hollywood 2018).

contact Louisette Geiss the day after she was assaulted to invite her to travel on TWC's private plane.

326.     Schneeweiss has declared on various occasions that she was not aware that the victims were assaulted. However several Class members have publicly described seeing Schneeweiss after the assault occurred but Schneeweiss would purposefully not look them in the eyes.

327.     Moreover, Louisette Geiss confronted Schneeweiss on two occasions. First the day after the assault, when Schneeweiss called Geiss to invite her to travel on the TWC private plane, Geiss made clear that she would not ride alone with Weinstein and asked how many people would be on the plane. Schneeweiss assured her there would be at least 10 people on the plane (there were not). Then, in or about 2011, Geiss told Schneeweiss that Weinstein was totally inappropriate and a "bad" guy. Schneeweiss's only response was that Weinstein had never assaulted her.

328.     Despite her extensive knowledge, Schneeweiss failed to cause any independent investigations to be undertaking or take any actions to prevent or diminish the likelihood of further assaults – but rather continued to facilitate the assaults throughout her tenure at TWC.

**F.     The TWC Board's termination of Harvey Weinstein is too little, too late.**

329.     On October 5, 2017, The New York Times published the story entitled "Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades."

330.     That same day, Harvey Weinstein issued a statement to the New York Times, which stated:

I came of age in the 60's and 70's, when all the rules about behavior and workplaces were different. That was the culture then.

I have since learned it's not an excuse, in the office - or out of it. To anyone.

I realized some time ago that I needed to be a better person and my interactions with the people I work with have changed.

I appreciate the way I've behaved with colleagues in the past has caused a lot of pain, and I sincerely apologize for it.

Though I'm trying to do better, I know I have a long way to go. That is my commitment. My journey now will be to learn about myself and conquer my demons. Over the last year I've asked Lisa Bloom to tutor me and she's put together a team of people. I've brought on therapists and I plan to take a leave of absence from my company and to deal with this issue head on. I so respect all women and regret what happened. I hope that my actions will speak louder than words and that one day we will all be able to earn their trust and sit down together with Lisa to learn more. Jay Z wrote in 4:44 "I'm not the man I thought I was and I better be that man for my children." The same is true for me. I want a second chance in the community but I know I've got work to do to earn it. I have goals that are now priorities. Trust me, this isn't an overnight process. I've been trying to do this for 10 years and this is a wake-up call. I cannot be more remorseful about the people I hurt and I plan to do right by all of them.

I am going to need a place to channel that anger so I've decided that I'm going to give the NRA my full attention. I hope Wayne LaPierre will enjoy his retirement party. I'm going to do it at the same place I had my Bar Mitzvah. I'm making a movie about our President, perhaps we can make it a joint retirement party. One year ago, I began organizing a $5 million foundation to give scholarships to women directors at USC. While this might seem coincidental, it has been in the works for a year. It will be named after my mom and I won't disappoint her.

331.    That evening, all nine directors—including Harvey Weinstein, Robert Weinstein, Lance Maerov, Tarak Ben Ammar, Richard Koenigsberg, Paul Tudor Jones, Dirk Ziff, Marc Lasry, and Tim Sarnoff—met via conference call. During the telephone call, Harvey insisted that the stories were not true. He insisted that the telephone call did not count as an official board meeting, and that the Board had no legal authority to remove him. Nonetheless, Harvey agreed to a temporary leave of absence.[195]

---

[195] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

332.    During the call, Jones expressed doubts on the Board's ability to legally remove Harvey. Jones stated that terminating Harvey could be viewed by lenders as a "material event," triggering a debt default by TWC.[196]

333.    On October 6, 2017, Dirk Ziff, Marc Lasry, and Tim Sarnoff resigned as Board members.

334.    That evening, four Board members (Robert Weinstein, Ben Ammar, Maerov, and Koenigsberg) issued a release stating that Harvey Weinstein was taking "an indefinite leave of absence," adding that "It's important for him to get the professional help for the problems he has acknowledged." The board also announced an independent investigation.

335.    Jones did not sign the October 6, 2017 release. Rather than independently condemn the assault allegations, Jones sent an email on October 6, 2017 to Maerov, stating: "At this time I would prefer NOT to sign it as the last paragraph about Bob taking control implies levels of legality and board authority that I don't fully comprehend or understand. Respectfully, Paul".

336.    On October 7, 2017, Jones sent Harvey an email, telling him: "I love you." Jones encouraged him to "'Focus on the future as America loves a great comeback story," and stated: "The good news is, this will go away sooner than you think and it will be forgotten!"

337.    Jones resigned from the Board on October 7, 2017.

338.    On Sunday, October 8, 2017, the Board met again, and voted to terminate Harvey.

339.    Koenigsberg resigned on or about October 14, 2017.

---

[196] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

**G.** **The statutes of limitations are tolled by the pendency of the *Geiss* class action, equitable estoppel, duress, and the continuing violations doctrine.**

340.    First, the statutes of limitations are tolled due to the pendency of the *Geiss* class action.

341.    Second, the statutes of limitations are tolled due to duress.

342.     The power Weinstein wielded—and his ability to blacklist an entertainment industry participant for complaining about his predatory behavior—was so legendary that it was the rule in the entertainment industry that women needed to acquiesce to Weinstein to succeed. This rule was so widely accepted that male producers and actors laughingly voiced their expectations that Plaintiff and the Class had and would follow it to further their careers. For example, at the 2013 Academy Awards ceremony, Seth MacFarlane, the creator of *Family Guy*, was onstage to announce the five nominees for best supporting actress when he stated: "Congratulations, you five ladies no longer have to pretend to be attracted to Harvey Weinstein."[197]

343.    If women did not accede to his demands, "Weinstein and his associates used nondisclosure agreements, payoffs, and legal threats to suppress their accounts."[198] This uniform response to those who challenged Weinstein's behavior, which was widely known throughout the industry, actually and reasonably placed Class members under duress and induced them to forebear asserting their legal rights in response to Weinstein's actions.

344.    Weinstein's pattern of abuse continued unabated until at least October 2017.

---

[197] James Hibberd, *Seth MacFarlane explains his Harvey Weinstein joke in emotional post*, ENTERTAINMENT WEEKLY (Oct. 11, 2017), http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/.

[198] Farrow, *supra* note 10.

345.     The statute of limitations was thus tolled at least until *The New York Times* published a powerful report revealing allegations of sexual harassment against Weinstein, which led to the resignation of four members of TWC's Board and to the firing of Weinstein. According to TWC Board Member Maerov, it was not until TWC fired Weinstein and took away his power in the industry that Weinstein's victims felt comfortable enough to complain. Maerov stated: "Once he was out, the women he'd abused knew there was no way he could harm them professionally. Firing him was crucial to opening the floodgates."[199]

346.     Third, the statutes of limitation are tolled under the doctrine of equitable estoppel.

347.     Plaintiffs have alleged that each Defendant had knowledge of Weinstein's pattern of abuse and efforts to control, threaten, silence, and blacklist his abuse victims.

348.     "Weinstein enforced a code of silence; employees of the Weinstein Company have contracts saying they will not criticize it or its leaders in a way that could harm its 'business reputation' or 'any employee's personal reputation,' a recent document shows."[200] All Defendants had knowledge of, and helped perpetuate and enforce, Weinstein's code of silence.

349.     Because of Defendants' affirmative actions to conceal Weinstein's pattern of abuse, and to help enforce this code of silence, Class Members had no knowledge of their negligent retention and ratification claims against Defendants until The New York Times published its report in October 2017.

350.     Defendant TWC took affirmative actions to conceal its knowledge and facilitation of Weinstein's pattern of abusing, blacklisting, and silencing women from Class Members, thereby misrepresenting to Class Members that they had no claims against TWC.

---

[199] Tully, *supra* note 6.

[200] Kantor & Twohey, *supra* note 1.

351.    Employees of TWC signed contracts stating that they would not criticize the company or its leader in a way that could harm its "business reputation" or "any employee's personal reputation," thus requiring that they not speak about Weinstein's pattern of abusing, blacklisting, and silencing of women to the Class.

352.    When employees or others complained about Weinstein's sexual misconduct, TWC simply forwarded the complaints to Harvey Weinstein, knowing that Weinstein would take further steps to threaten or otherwise silence the complainants.

353.    TWC funds were used for payouts as part of settlement agreements with Weinstein's victims. Those agreements, which contained non-disclosure provisions, were intended to make victims remain silent and release their claims against Weinstein and/or TWC.

354.    In 2016 (and before), TWC retained attorney David Boies, Kroll Associates, Inc. and Corporate Risk Holdings to cover up Harvey Weinstein's pattern of assault, and to suppress information by spying on, threatening, extorting, and otherwise silencing victims.

355.    TWC Directors took affirmative actions to conceal their knowledge and facilitation of Weinstein's pattern of abusing, silencing, and blacklisting women from Class Members, thereby misrepresenting to Class Members that they had no claims against TWC or its Directors.

356.    Tarak Ben Ammar, Dirk Ziff, Lance Maerov, Robert Weinstein, Tim Sarnoff, Richard Koenigsberg, James Dolan and Paul Tudor Jones knew or should have known, about NYPD's sting involving Harvey and Amber Battilana Gutierrez. However, they did not require Harvey Weinstein to reaffirm the company's code of conduct, and they renewed his employment contract in 2015.

357.     Moreover, when the Board, including Tarak Ben Ammar, Dirk Ziff, Lance Maerov, Robert Weinstein, Tim Sarnoff, Richard Koenigsberg, James Dolan, and Paul Tudor Jones demanded to see Harvey's personnel file during the course of negotiating his 2015 contract, Harvey's lawyer David Boies refused. While the board could have sued for access to the file, they decided not to because they knew it "could have been very damaging to the company" and because Harvey had agreed to hold TWC and Directors harmless for any liability resulting from "any incident, resolved or unresolved, disclosed in his personnel file." [201]

358.     Defendant Robert Weinstein took affirmative actions to conceal his knowledge and facilitation of Weinstein's pattern of abusing, silencing, and blacklisting women from Class Members, thereby misrepresenting to the Class that they had no claims against Robert Weinstein, Miramax, or TWC. For example, Robert Weinstein paid settlements—using his personal funds— to several of Harvey Weinstein's victims in order to require them to stay silent and release their claims, including to former Miramax employee Zelda Perkins and another female Miramax employee in the UK.

359.     Defendant David Glasser took affirmative actions to conceal his knowledge and facilitation of Weinstein's pattern of abusing, silencing, and blacklisting women from Class Members, thereby misrepresenting to the Class that they had no claims against Glasser or TWC. For instance, until 2017 Glasser oversaw the human resources department at TWC, which mishandled the numerous complaints about Weinstein's sexual misconduct, in part by failing to document them, hiding them, and forwarding them to Harvey Weinstein himself so that Weinstein could threaten and silence the complainant. Glasser also facilitated payments to victims in order to procure their silence and require them to release their claims.

---

[201] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

360.    Defendant Frank Gil took affirmative actions to conceal his knowledge and facilitation of Weinstein's pattern of abuse, silencing, and blacklisting of women from Class Members, thereby misrepresenting to Class Members that they had no claims against Gil or TWC. For instance, until 2017 Gil oversaw the human resources department at TWC, which mishandled the numerous complaints about Weinstein's sexual misconduct, in part by failing to document them, hiding them, and forwarding them to Harvey Weinstein himself so that Weinstein could threaten and silence the complainant. Gil sought compensation from Harvey Weinstein for providing him with confidential information from human resources files regarding the complaints. On or about October 1, 2017, Gil entered the offices of TWC employees in order to destroy personnel files containing evidence of Harvey's sexual abuse of women.

361.    Defendant Barbara Schneeweiss took affirmative actions to conceal her knowledge and facilitation of Weinstein's pattern of abuse, silencing, and blacklisting of women from Class Members, thereby misrepresenting to Class Members that they had no claims against Schneeweiss or TWC. For instance, Schneeweiss regularly delivered women for "meetings" and then left them to be assaulted by Weinstein, affirmatively representing to victims that she had no knowledge of Weinstein's systematic abuse. She placated Weinstein's victims after their assaults in an attempt to prevent them from reporting Weinstein. For instance, Schneeweiss corresponded and met with Melissa Thompson and another victim (after the assaults occurred) under the guise they were going to be part of a new show called Women Inc. Schneeweiss responded to Louisette Geiss that Weinstein had never assaulted her, misrepresenting to Geiss the fact that she knew Weinstein had assaulted many others.

362.     Plaintiff and the Class was compelled by fear of safety to forebear their claims against Weinstein until at least 2017.

363.     Asia Argento, an Italian film actress and director, said that she did not speak out until 2017, after Weinstein had "forcibly performed oral sex on her" years before, "because she feared that Weinstein would 'crush' her. 'I know he has crushed a lot of people before . . . That's why this story—in my case, it's twenty years old, some of them are older—has never come out.'"[202]

364.     Four actresses, including Mira Sorvino and Rosanna Arquette, told *The New Yorker* that "they suspected that, after they rejected Weinstein's advances or complained about them to company representatives, that Weinstein had them removed from projects or dissuaded people from hiring them."[203] Multiple sources told the same reporter that "Weinstein frequently bragged about planting items in media outlets about those who spoke against him; these sources feared similar retribution."[204]

365.     Weinstein and his companies worked to blacklist women who had refused his sexual advances. In or about 1998, Mira Sorvino and Ashley Judd had been chosen to star in the *Lord of the Rings*, when the franchise was still under the umbrella of Miramax. Peter Jackson, the film's director, confirmed that Miramax stepped in and told him that Judd and Sorvino were "a nightmare to work with and we should avoid them at all costs."[205]

---

[202] *Id.*

[203] Farrow, *supra* note 8.

[204] *Id.*

[205] Nardine Saad, *Peter Jackson says Weinsteins blacklisted Ashley Judd, Mira Sorvino; Harvey Weinstein disagrees*, LOS ANGELES TIMES (Dec. 15, 2017), http://www.latimes.com/

366.    Several sources "pointed to Gutierrez's case: after she went to the police, negative items discussing her sexual history and impugning her credibility began rapidly appearing in New York gossip pages. (In the taped conversation, part of which *The New Yorker* posted online, Weinstein asks Gutierrez to join him for "five minutes," and warns, "Don't ruin your friendship with me for five minutes.")[206]

367.    Women who spoke to *The New Yorker* on condition of anonymity "were too afraid to allow [the author] to use their names, but their stories are uncannily similar to these allegations. One woman who worked with Weinstein, explained her reluctance to be identified. 'He drags your name through the mud, and he'll come after you hard with his legal team.'"[207]

368.    Mira Sorvino, who rejected Weinstein's advances and complained about his harassment to Miramax, "felt that saying no to Weinstein and reporting the harassment had ultimately hurt her career." She told a reporter from *The New Yorker*, "I definitely felt iced out and that my rejection of Harvey had something to do with it."[208]

369.    After Gwyneth Paltrow was harassed, she complained to her then-boyfriend Brad Pitt, who confronted Weinstein, who subsequently called and berated Paltrow for disclosing what happened. Paltrow feared she would be fired from the Miramax film *Emma* if she complained further.[209]

---

entertainment/la-et-entertainment-news-updates-peter-jackson-ashley-judd-mira-sorvino-weinstein-1513362464-htmlstory.html.

[206] Farrow, *supra* note 8.

[207] *Id.*

[208] *Id.*

[209] Kantor & Abrams, *supra* note 13.

370.   After Judith Godrèche complained to a female producer at Miramax about Weinstein's harassment, she was told to refrain from saying anything further, so as not to endanger the release of the Miramax films in which she appeared.[210]

371.   Darryl Hannah felt immediate repercussions from turning down Weinstein's advances and sexual demands. A Miramax plane on a film tour left without her, her plane and hotel reservations were cancelled, and her hair and make-up artist was let go.[211] Hannah was not about to let Weinstein's actions go, however—she complained to her manager, a producer on the film, and her director, Quentin Tarantino, who has since admitted that he did nothing.[212] Nonetheless, Hannah not only was not believed but also, consistent with the objectives of the Weinstein Sexual Enterprise, was "berated, criticized, and blamed."[213]

372.   The type of emotional and physical abuse Weinstein used to command silence from his victims and to cover up his assaults has been studied by psychologists. John Gottman and Neil Jacobsen, psychologists and authors of *When Men Batter Women* (first published in 1998 and reissued in 2007), extensively researched emotional abuse and domestic violence and created a 27-question survey designed to help doctors establish whether patients were suffering from systematic abuse at the hands of a partner. The four factors that determine emotional violence, Gottman and Jacobson concluded, were isolation, degradation, sexual abuse, and property damage. Each of these factors can be found in Weinstein's abuse of Plaintiffs and the Class.

---

[210] *Id.*

[211] Farrow, *supra* note 8.

[212] *Id.*

[213] *Id.*

373.   Shortly before *The New York Times* and *The New Yorker* finally revealed the decades-long pattern of harassment, Weinstein and his legal team began calling Class members and threatening them for talking. They also threatened to sue *The New York Times* and other media outlets.[214]

374.   According to TWC Board Member Maerov, it was not until TWC fired Weinstein and took away his power in the industry that Weinstein's victims felt comfortable enough to complain. Maerov stated: "Once he was out, the women he'd abused knew there was no way he could harm them professionally. Firing him was crucial to opening the floodgates."[215]

375.   The statutes of limitations for Plaintiff' state law tort claims are tolled by the continuing violations doctrine.

376.   Plaintiff has pled facts to show that Weinstein's pattern of sexually abusing, manipulating, grooming, threatening, and silencing her continued unabated until 2017. Moreover, Defendant TWC, TWC Officers, and TWC Directors' negligent retention of Harvey Weinstein continued until October 2017.

## V.   CLASS ALLEGATIONS

377.   Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(c)(4) on behalf of herself and the following "Nationwide TWC Class":

> All women who met with Harvey Weinstein in person (i) to audition for or to discuss involvement in a project to be produced or distributed by The Weinstein Company Holdings, LLC or its affiliates ("TWC"), or (ii) in a meeting or event facilitated, hosted, or underwritten by TWC.

---

[214] Farrow, *supra* note 8.

[215] Tully, *supra* note 6.

378.     The Class consists of dozens, if not hundreds, of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members are ascertainable through records maintained by Weinstein, the Defendants, and members of the Weinstein Sexual Enterprise. For example, one former employee of TWC told *The New Yorker* that "she was asked to keep track of the women, who, in keeping with a practice established by Weinstein's assistants, were all filed under the same label in her phone: F.O.H., which stood for 'Friend of Harvey.'"[216]

379.     The claims of Plaintiff are typical of the Class. The claims of the Plaintiff and the Class are based on the same legal theories and arise from the same unlawful pattern and practice of sexual harassment and assault.

380.     There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect only individual Class members within the meaning of Fed. R. Civ. P. 23(a)(2) and (c)(4).

381.     Common questions of fact and law affecting members of the Class include, but are not limited to, the following:

a.     Whether the Defendants knew or should have known of Harvey Weinstein's pattern of and propensity for sexual harassment, misconduct and assault;

b.     The date by which the Defendants knew or should have known of Harvey Weinstein's pattern of and propensity for sexual harassment, misconduct and assault;

c.     Whether Harvey Weinstein engaged in sex trafficking;

---

[216] Farrow, *supra* note 10.

d.      Whether Defendants knew or should have known TWC was a venture engaged in sex trafficking;

e.      Whether Weinstein engaged in a pattern and practice of sexual harassment, assault, and battery.

f.      Whether Weinstein's pattern and practice of sexual harassment, assault, and battery was committed within the scope of his employment at TWC.

g.      Whether TWC, TWC's Directors or Officers facilitated Weinstein's pattern and practice of sexual harassment, assault, and battery.

h.      Whether TWC, TWC's Directors or Officers ratified Weinstein's pattern and practice of sexual harassment, assault, and battery.

i.      Whether TWC, TWC's Directors or Officers engaged in conduct designed to suppress complaints or reports regarding Weinstein's conduct.

j.      Whether TWC, TWC's Directors or Officers negligently retained or supervised Weinstein.

k.      Whether TWC or its Officers and Directors are responsible for Weinstein's conduct under the doctrine of *respondeat superior*.

382.    Absent a class action, most of the members of the Class would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, particularly as to TWC, TWC's Directors or Officers' legal responsibility for Weinstein's actions, in that it conserves the resources of the courts and the litigants and promotes the consistency and efficiency of adjudication.

383.     Plaintiff will fairly and adequately represent and protect the interests of the Class.

Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and

class actions. Plaintiff and her counsel are committed to vigorously prosecuting this action on

behalf of the other Class members, and have the financial resources to do so. Neither Plaintiff

nor her counsel have any interests adverse to those of the other members of the Class.

## VI.    CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1591, 1595 (SEX TRAFFICKING)
### (PLAINTIFF JILL DOE VERSUS HARVEY WEINSTEIN)

384.     Plaintiff Jill Doe incorporates by reference all preceding paragraphs, as if fully set

forth herein.

385.     In violation of 18 U.S.C. § 1591, Harvey Weinstein knowingly, in or affecting

interstate or foreign commerce, recruited, enticed, or solicited Plaintiff and members of the Class

knowing that means of force, threats of force, fraud, or coercion (or a combination thereof)

would be used to cause Plaintiff to engage in any sex act on account of which anything of value

would be given to or received by any person.

386.     The statute of limitations for violations of the sex trafficking statute is 10 years.

15 U.S.C. § 1595. Plaintiff was affected within the 10 years prior to filing suit.

387.     Harvey Weinstein's actions knowingly affected interstate or foreign commerce.

With respect to Jill Doe, Weinstein met with her in New York, Los Angeles, London, and

Cannes, France to discuss her film productions and purported to give her directions on how to be

successful under his mentorship.

388.     Harvey Weinstein recruited, enticed, or solicited Plaintiff by any means.

Weinstein invited Jill Doe to share her first short film with him, as well as a script she was

interested in producing, to receive his guidance and critiques. Because she originally had several

professional meetings with him, she was excited to have a powerful mentor in her corner to help her career.

389.    Weinstein knew that he would use fraud, physical force or coercion (as he had done many times before with other actresses, directors, producers, employees, and other persons pitching business deals) on Plaintiff and Class Members for a sexual encounter.

390.    Weinstein was well aware that a role in one of his projects, or the chance to work for him directly, or his agreement to produce a script a woman had written, or an engagement of a new technology to promote his films was of significant commercial value to Plaintiff and Class Members, and used this value, or the prospective use of his influence on Plaintiff's behalf, to recruit and entice Jill Doe to private locations, including his hotel room and office, where he would perform sex acts.

391.    Weinstein's role in one of her projects, or the chance to work for him directly, or his agreement to produce a script a woman had written, or an engagement of a new technology to promote his films was successful in enticing Plaintiff and Class Members to his hotel room, home or office. Plaintiff felt compelled to attend the meetings—and to comply with Weinstein's acts toward her up to and until he used forceful restraint to prevent her from refusing further— because of the benefits she would receive from his power and influence in the industry.

392.    Weinstein knew that the promise to critique her productions or the use of his influence on her behalf would entice Jill Doe to meet with him, and to follow him when he pretended he needed to pick up work materials in his hotel room. He knew that once Jill Doe was in his hotel room, he would be in a position to force the sexual activity he desired. During the initial assault, he used brute force to hold her, to push her head to his genitals to fellate him, and

to prevent her from leaving the hotel room. After that, he used physical force, mental abuse and manipulation to abuse and assault Jill Doe.

393.    Weinstein had no intention of following through with the advancement of Jill Doe's career. Instead, he used this ploy as a fraudulent means of obtaining sexual gratification.

394.    By virtue of these violations of 18 U.S.C. §§ 1591 and 1595, Harvey Weinstein is liable to Plaintiff for the damages she sustained and reasonable attorneys' fees.

**COUNT II**

**VIOLATION OF 18 U.S.C. §§ 1591 AND 1595 (PARTICIPATION IN A VENTURE ENGAGED IN SEX TRAFFICKING)**
**(PLAINTIFF JILL DOE VERSUS TWC, THE TWC DIRECTORS AND TWC OFFICERS)**

395.    Plaintiff Jill Doe incorporates by reference all preceding paragraphs, as if fully set forth herein.

396.    18 U.S.C. § 1595 provides in pertinent part that an individual who is a victim of sex trafficking under 18 U.S.C. § 1591 may bring a civil action against "any person whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or **should have known** has engaged in an act in violation of this chapter."

397.    **First**, as set forth above and in Count I, Harvey Weinstein engaged in acts in violation of 18 U.S.C. § 1591.

398.    **Second**, as set forth above, each of TWC, the TWC Directors and the TWC Officers knew or should have known that Harvey Weinstein was engaging in acts that constitute sex trafficking in violation of 18 U.S.C. § 1591, and was using TWC funds and employees to facilitate those acts.

- 115 -

399.    Each of TWC, the TWC Directors, and the TWC Officers benefitted financially from their participation in the cover-up and venture because it ensured that Harvey Weinstein continued to produce movies, ensuring that TWC continued to make money or receive financing, the TWC Directors' investments (direct or through their respective companies) continued to make money, the Directors and Officers continued to receive the social benefits and power within the film industry, and the TWC Officers continued to receive their paychecks, bonuses and other incentives.

400.    Each of TWC, the TWC Directors and the TWC Officers also benefitted through the receipt of perks and social status. As Maerov and Ben Ammar explained: "'Weinstein traded on those friendships, on his social currency,' says Maerov. 'He spun a kind of spiderweb,' says Ben Ammar. 'He had three tables at the Oscars, he had Emmy parties, he hosted bankers, investors and politicians at glamorous events. He could be so charming. He was Mr. Charming and Mr. Bully all in one. Lots of prominent people, including TWC directors, got caught in the spiderweb.'"[217]

401.    Once Weinstein's wrongdoing was publicized, TWC quickly spiraled into bankruptcy. The TWC Directors and Officers knew that they had to cover up Harvey Weinstein's wrongdoing – or the collapse of TWC and their fortunes in it would have occurred much earlier.

402.    18 U.S.C. § 1595 does not require that the benefactors of the venture knew or should have known of the specific victim that is bringing the suit. Rather, it is sufficient that the Defendants knew or should have known that Weinstein had engaged in acts that constituted a violation of 18 U.S.C. § 1591.

---

[217] http://fortune.com/2017/11/19/weinstein-scandal-board-battles/

403.     The statute of limitations for violations of the sex trafficking statute is 10 years. 15 U.S.C. § 1595. Plaintiff was affected within the 10 years prior to filing suit.

404.     By virtue of these violations of 18 U.S.C. §§ 1591 and 1595, Defendants are liable to Plaintiff for the damages they sustained and reasonable attorneys' fees.

**COUNT III**

**NEGLIGENT SUPERVISION AND RETENTION**
**(JILL DOE VERSUS TWC, TWC'S DIRECTORS, AND TWC'S OFFICERS)**

405.     Plaintiff Jill Doe restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

406.     At all times material from September 30, 2005 to October 2017, TWC employed Weinstein and Weinstein was an executive and/or director of TWC.

407.     Weinstein was unfit or incompetent to work directly with Class members and women in the entertainment industry and posed a particular risk of sexually harassing and assaulting them.

408.     TWC, TWC's Directors, and Officers knew or should have known not only that Weinstein was unfit or incompetent to work directly with Class members and women in the entertainment industry and posed a particular risk of sexually harassing and assaulting them, but also that this unfitness created a particular risk to Plaintiff and the Class.

409.     Weinstein's unfitness and particular risk to women in the entertainment industry harmed Plaintiff and the Class.

410.     The negligence of TWC, its Directors, and its Officers in supervising and or retaining Weinstein was a substantial factor in causing harm to Plaintiff and the Class, causing substantial damages.

## COUNT IV

## CIVIL BATTERY
## (JILL DOE VERSUS TWC, TWC DIRECTORS AND TWC OFFICERS)

411.    Plaintiff Jill Doe restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

412.    Weinstein intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Plaintiff and the Class members. He did so by, *inter alia*:

       a.    Isolating Plaintiff and Class members in closed quarters and dismissing any bystanders; and

       b.    Demanding or threatening sexual contact.

413.    Weinstein did commit an unwanted contact with Plaintiff and the Class members' person or property in a harmful or offensive manner, including, but not limited to, causing sexual contact between Weinstein and each Class member.

414.    Weinstein's battery of Plaintiff and the Class caused harm, including physical, mental, and/or emotional harm of each Class member.

415.    Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class member lured with the prospect of being cast in a TWC production or to meet or work with TWC and Weinstein was foreseeable given, *inter alia*, the use of TWC employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

416.    Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context

of the "casting couch" are exactly why female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

417.    Holding TWC, TWC Directors, and TWC Officers liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiff and the Class members do not have separate remedies under Title VII because they were not employees of TWC.

## COUNT V

### ASSAULT
### (JILL DOE VERSUS TWC, TWC DIRECTORS, AND TWC OFFICERS)

418.    Plaintiff Jill Doe restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

419.    Weinstein intended to cause apprehension of harmful or offensive conduct against Plaintiff and the Class members. He did so by, *inter alia*:

a.    Isolating Plaintiff and the Class members in closed quarters and dismissing any bystanders;

b.    Demanding or threatening sexual contact;

c.    Cornering, chasing, blocking, or otherwise using his heft to cause Plaintiff and the Class to fear that Weinstein had the ability to carry out his physical threats; and

d.    Threatening harm to the careers and reputations of Plaintiff and the Class members if they did not participate in such conduct.

420.    Weinstein's actions did, in fact, cause Plaintiff and the Class members to fear imminent harmful or offensive contact by Weinstein.

421.    Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class member lured with the prospect of being cast in a TWC production or to meet or work with TWC and Weinstein was foreseeable given, *inter alia*, the use of TWC employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

422.    Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context of the "casting couch" are exactly why Class members and other female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

423.    Holding TWC, TWC Directors, and TWC Officers liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiff and the Class members do not have separate remedies under Title VII because they were not employees of TWC.

**COUNT VI**

**FALSE IMPRISONMENT**
**(JILL DOE VERSUS TWC, TWC DIRECTORS, AND TWC OFFICERS)**

424.    Plaintiff Jill Doe restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

425.    Plaintiff and Class members were willfully detained by Weinstein, without their consent, while he battered, assaulted, and attempted to assault them.

426.     Weinstein willfully detained Plaintiff and Class Members through physical force and/or through intimidation. In many instances, Weinstein used such intimidation that Plaintiff and Class Members stopped resisting rather than risk injury or death.

427.     Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class member lured with the prospect of being cast in a TWC production or to meet or work with TWC and Weinstein was foreseeable given, *inter alia*, the use of TWC employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

428.     Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context of the "casting couch" are exactly why Class members and other female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

429.     Holding TWC, TWC Directors, and TWC Officers liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiff and the Class members do not have separate remedies under Title VII because they were not employees of TWC.

## COUNT VII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (JILL DOE VERSUS TWC, TWC DIRECTORS, AND TWC OFFICERS)

430.     Plaintiff Jill Doe restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

431.    Weinstein's extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiff and the Class members.

432.    Weinstein's outrageous conduct was not the type of ordinary rude or obnoxious behavior that women should be expected to weather. Rather, Weinstein's conduct exceeded all possible bounds of decency.

433.    Weinstein acted with intent or recklessness, knowing that his female victims were likely to endure emotional distress. Indeed, he used this distress to subdue and threaten the women and prevent them from complaining or suing based on his actions. He did so with deliberate disregard as to the high possibility that severe emotional distress would occur.

434.    Weinstein's conduct caused suffering for Plaintiff and the Class members at levels that no reasonable person should have to endure. In fact, Robert Weinstein admitted that: "My brother has caused unconscionable suffering."[218]

435.    Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class member lured with the prospect of being cast in a TWC production or to meet or work with TWC and Weinstein was foreseeable given, *inter alia*, the use of TWC employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

436.    Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context

---

[218] https://www.hollywoodreporter.com/news/bob-weinstein-gets-emotional-depraved-harvey-saving-company-his-waking-nightmare-1048905

of the "casting couch" are exactly why Class members and other female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

437.    Holding TWC, TWC Directors, and TWC Officers liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiff and the Class members do not have separate remedies under Title VII because they were not employees of TWC.

## COUNT VIII

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (JILL DOE VERSUS TWC, TWC DIRECTORS, AND TWC OFFICERS)

438.    Plaintiff Jill Doe restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

439.    Weinstein's conduct negligently caused emotional distress to Plaintiff and the Class members.

440.    Weinstein could reasonably foresee that his action would have caused emotional distress to Plaintiff and the Class members.

441.    Plaintiff and the Class members were in a specific zone of danger meeting with Weinstein and at risk of physical harm, causing their fear.

442.    Plaintiff and the Class members, immediately or shortly after meeting with Weinstein, suffered distress and emotional harm.

443.    Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class member lured with the prospect of being cast in a TWC production

or to meet or work with TWC and Weinstein was foreseeable given, *inter alia*, the use of TWC employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

444.     Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context of the "casting couch" are exactly why Class members and other female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

445.     Holding TWC, TWC Directors, and TWC Officers liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiff and the Class members do not have separate remedies under Title VII because they were not employees of TWC.

## COUNT IX

### RATIFICATION
### (JILL DOE VERSUS TWC, TWC DIRECTORS, AND TWC OFFICERS)

446.     Plaintiff Jill Doe restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

447.     Weinstein was an agent, director, and employee of TWC until October 2017.

448.     At the time of the acts alleged herein, there was an actual or assumed agency relationship between Weinstein and TWC, as well as between Weinstein and TWC's Board of Directors, and Weinstein and TWC's Officers.

449.     All acts or omissions alleged herein after September 30, 2005, were ratified by TWC, and its Directors and Officers. TWC, and its Directors and Officers, had investigated or knew of the acts and omissions of Weinstein, and TWC's employees, managers, supervisors,

executives, and directors were informed that Weinstein was sexually abusing female actors and members of the entertainment industry and refused to take any action to stop him. Moreover, TWC's managers, supervisors, executives, and directors hid this information so that Weinstein could continue to work for TWC.

450.    Despite knowledge of Weinstein's sexual misconduct, no disciplinary action was taken and he was allowed to be alone with women while on TWC business.

451.    TWC, its Directors, and its Officers are thus responsible for Weinstein's acts of assault, battery, and intentional or negligent infliction of emotional distress.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all Class members, prays that this Court:

A.    Certify the Class pursuant to Fed. R. Civ. P. 23(c)(4) for liability and reserve damages, name Plaintiff as representative of the Class, and appoint her lawyers as Class Counsel;

B.    Enter judgment against Defendants on liability in favor of Plaintiff and the Class;

C.    In individual damage proceedings and prove-ups, award Plaintiff and the Class members damages for pain and suffering, and compensatory and punitive damages against each of the Defendants in accordance with the judgments;

D.    Award Plaintiff's counsel attorneys' fees and costs, and grant Plaintiff a service award as class representative; and

E.    Grant such other and further relief as this Court deems appropriate.

010717-11/1104435 V2

DATED: April 17, 2019

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Jason Zweig*
Jason Zweig
HAGENS BERMAN SOBOL SHAPIRO LLP
555 Fifth Avenue, Suite 1700
New York, NY 10017
jasonz@hbsslaw.com

Elizabeth A. Fegan
Whitney K. Siehl
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Tel: (708) 628-4949
Fax: (708) 628-4950
beth@hbsslaw.com
whitneys@hbsslaw.com

Steve W. Berman
Shelby Smith
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com
shelby@hbsslaw.com

010717-11/1104435 V2